[No. D052365. Fourth Dist., Div. One. Dec. 12, 2012.]

LES BRADLEY et al., Plaintiffs and Appellants, v.
NETWORKERS INTERNATIONAL, LLC, Defendant and Respondent.

## Counsel

Aiman-Smith & Marcy, Randall B. Aiman-Smith, Reed W. L. Marcy and Hallie Von Rock for Plaintiffs and Appellants.

Seyfarth Shaw, Jonathan D. Meer, Brandon R. McKelvey, Ann H. Qushair and Dennis S. Hyun for Defendant and Respondent.

## Opinion

**HALLER, J.**—Three plaintiffs[1] filed a class action complaint against Networkers International, LLC (Networkers), alleging violations of wage and hour laws including those governing overtime pay, rest breaks, and meal breaks. Plaintiffs moved to certify the class, but the court denied the motion, concluding plaintiffs did not meet their burden to show common factual and legal questions would predominate over individual issues. Plaintiffs appealed. In February 2009, we filed an unpublished opinion (*Bradley I*) affirming the trial court's order, concluding the court's ruling was not an abuse of discretion.

In May 2009, the California Supreme Court granted plaintiffs' petition for review, and ordered the *Bradley I* case held pending the high court's decision

---

[1] The plaintiffs are Les Bradley, Edwin Jennings, and Versil Milton.

in *Brinker Restaurant Corp. v. Superior Court* (Cal.App.). Three years later, in April 2012, the California Supreme Court issued its *Brinker* decision. (*Brinker Restaurant Corp. v. Superior Court, supra*, 53 Cal.4th 1004 (*Brinker*).) The court then remanded *Bradley I* to this court "with directions to vacate its decision and to reconsider the cause in light of *Brinker* . . . ."

Following the remand, the parties submitted extensive supplemental briefs pertaining to *Brinker* and other judicial decisions filed after our previous opinion. After reexamining the record in light of *Brinker*, we conclude the trial court erred in refusing to certify the class with respect to each of plaintiffs' claims except for the claims based on alleged off-the-clock violations. With respect to these claims, we remand for the court to reconsider the certification issues in light of this opinion and *Brinker*.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

Networkers is a business that provides technical personnel services to the telecommunications industry. In about 2004, Networkers contracted with three telecommunications companies, EXi Parsons Telecom LLC (EXi), Ericsson Inc. (Ericsson), and Telecom Network Specialists, to supply skilled laborers to install and service cell sites in Southern California.[3] Each of these contracts provided that the laborers would perform work under the direction of supervisors employed by the telecommunications company and set forth detailed requirements for worker qualifications and the work to be performed. Under these contracts, Networkers was responsible for recruiting and managing the workers and warranted the work would be performed in a satisfactory manner.

Networkers thereafter retained approximately 140 skilled workers, including the three named plaintiffs, to fulfill these contracts and provide repair and installation services at the cell sites. Most workers were hired to work on cell sites for a particular customer, e.g., some workers were hired and trained to work only on Ericsson/T-Mobile cell sites, and others were hired and trained to work only on EXi sites. Plaintiffs Bradley and Milton worked at Ericsson/T-Mobile cell sites and plaintiff Jennings worked at EXi cell sites.

[2] In reaching our conclusions, we reject Networkers's arguments that plaintiffs' supplemental briefs went beyond the scope of the Supreme Court's remand. Under the high court's direction, we focus our reconsideration of our prior opinion on the *Brinker* decision, including reviewing appellate decisions cited with approval by the *Brinker* court and appellate decisions filed after *Brinker* in which the appellate court applied and/or interpreted *Brinker*'s holdings.

[3] Cell sites are the tower facilities that receive and send radio transmissions to and from cellular phones. The Ericsson contract primarily concerned services for T-Mobile cell sites. For convenience, we shall refer to these sites as Ericsson/T-Mobile cell sites.

Networkers required each worker to sign a standard contract, entitled Independent Contractor Agreement, which stated the worker was an independent contractor rather than an employee. Based on its characterization of the workers as independent contractors, Networkers did not pay premium wages for overtime, compensate the workers for travel or waiting times, or establish a policy requiring meal or rest breaks.

In late 2005 or early 2006, plaintiffs Bradley and Jennings (along with numerous other workers) terminated their relationship with Networkers. Shortly after, Networkers replaced its Independent Contractor Agreement with an "Employment" agreement. Networkers began paying overtime wages to these workers, but did not implement a meal or rest break policy. Plaintiff Milton signed the new employment agreement, but left the company soon after.

Within several months, the three plaintiffs filed a class action lawsuit against Networkers, alleging Networkers violated wage and hour laws by failing to pay overtime and provide rest and meal breaks, failing to maintain required employment records, and requiring plaintiffs to underreport their hours. Plaintiffs claimed that although Networkers hired each worker using the standard Independent Contractor Agreement, the actual relationship was in fact an employer-employee relationship and therefore Networkers was governed by state wage and hour laws. Plaintiffs sought to represent a class of 140 technical support personnel who worked in California for Networkers at cell sites owned or operated by Networkers's customers.[4]

Based on these factual allegations, plaintiffs asserted seven causes of action: (1) failure to pay overtime compensation (Lab. Code,[5] §§ 510, 1194); (2) failure to provide adequate meal periods (§§ 226.7, 512; wage order No. 4); (3) failure to provide rest time (wage order No. 4); (4) failure to furnish accurate wage statements (§§ 226, 226.3; wage order No. 4); (5) failure to keep accurate payroll records (§§ 1174, 1174.5; wage order No. 4); (6) waiting time penalties (§ 201 et seq.); and (7) unfair business practices (Bus. & Prof. Code, § 17200 et seq.).

---

[4] The complaint defined the proposed class as: "All persons, whether designated by Networkers as an employee, or, contrary to fact and law, designated as a consultant or independent contractor, who are employed or have been employed by Networkers in California to work for Networkers' clients or Networkers' clients' telecommunications customers as non-exempt electronic technical support personnel, including technical services supporters, field technicians, cell site surveyor and others, to assist in the survey, deinstallation, installation, upgrading, maintenance, servicing and repair of such customers' facilities, cell sites and/or equipment . . . ."

[5] Further statutory references are to the Labor Code, unless otherwise specified. References to wage orders are to the 2001 Industrial Welfare Commission (IWC) wage orders. The wage orders are codified in the California Code of Regulations (Cal. Code Regs., tit. 8, §§ 11010–11170.)

Plaintiffs then moved to certify the complaint as a class action. In support, they submitted a copy of Networkers's standard Independent Contractor Agreement and produced evidence that it was signed by each putative class member. The agreement contained numerous provisions reflecting an independent contractor relationship, including that the worker was "responsible for determining when, where and how the Work is performed"; the worker was entitled to delegate the work or designate other individuals to perform the work; the worker could bid for the jobs; and the worker was required to maintain liability, errors and omissions, and workers' compensation insurance.

Each named plaintiff also proffered his declaration asserting that Networkers did not adhere to these contractual provisions, and instead treated all of its workers as employees, and these employment policies were uniformly applied to all putative class members. The declarations provided detailed descriptions of the manner in which each plaintiff was hired by Networkers, the work assignment process, and the nature of the job and working conditions. We summarize these declarations below.

In his declaration, plaintiff Milton stated that Networkers hired him in December 2004 as a field technician after being recruited by Networkers employee Pete Wu. Milton signed the standard Independent Contractor Agreement, but did not understand he was not an employee entitled to state law employee protections. Despite the express terms of the agreement, Milton was not required to have liability, errors and omissions, or workers' compensation insurance; he was not permitted to delegate the work; he was required to follow specific directions as to the scheduling and priority of the work; he was paid by the hour and did not bid for his employment; there was no negotiation regarding the hourly rate; and he was required to obtain a specific set of tools from Networkers and Networkers deducted money from his paycheck to pay for the tools. Additionally, Milton received introductory job training from Networkers.

With respect to his specific job assignments, Milton said he worked exclusively on cell sites owned by T-Mobile which contained equipment made by Ericsson. Milton was assigned approximately 45 to 50 cell sites and was responsible for maintenance, service, and repair of each of these cell sites. Milton received his daily assignments through the receipt of a "trouble ticket" on his computer e-mail or cell phone, which came from a Networkers switch technician or T-Mobile customer service. Milton said that before starting work each day, "Networkers required me to check my email on my computer at home for the trouble tickets I was to work on that day. I typically had as many as 25–30 trouble tickets. I was required to acknowledge receipt of all trouble tickets immediately."

Once Milton was at the jobsite, he "was not permitted to leave the site until the problem was fully resolved," which he said "meant that I could not simply stop for lunch or leave after an eight hour shift if the problem was not resolved—in fact doing so would lead to discipline if not immediate termination." Milton said: "If I happened to pass by a fast food restaurant between cell sites, and I was not rushing to a 'Critical' site, I would go through the drive-through and eat in my car while driving to the next cell site destination. . . . [¶] Similarly, because I was not allowed to leave a jobsite until the work was done, I regularly could not take any rest breaks while on site. I believed that I would be fired if I stopped working to take a rest break. Additionally, as Networkers set priority codes for the severity of cell site problems, I was required to arrive at the next cell site as soon as possible. As a result, I regularly did not have time to take a rest break between working on cell sites. [¶] . . . [¶] . . . Once the trouble ticket was resolved, I would email back to the switch techs or to T-Mobile to confirm that it was resolved. If the switch indicated the problem was ongoing, I had to stay and keep working until the problem was fixed. If I could not fix the problem, I would call a Networkers' supervisor or other tech to troubleshoot the problem over the telephone; if there was still a problem, a supervisor or other tech would come to the site in person. . . . Additionally, if a site went back down, the crew would be called back immediately . . . and they would not be allowed to submit the time spent on the call back." Milton also said he was required to travel long distances, but generally was not permitted to record his full travel times, and 12-hour days were "common." Milton was required to be " 'on-call' " at least one week each month. Although a Networkers supervisor was not always at each cell site location, a Networkers supervisor was always available by telephone. Milton submitted timesheets to Networkers and also entered his time on the customer's (Ericsson's) computer system.

In December 2005, Networkers informed Milton that it would be reclassifying him from an "Independent Contractor" status to "W2 Employee" status, beginning in January 2006. After the reclassification, Networkers reduced Milton's hourly pay, and paid for overtime hours. The work remained exactly the same, and Networkers did not change its policies regarding rest breaks and restrictive reporting times (off the clock, on call, and travel time).

The declaration of plaintiff Bradley, who worked for Networkers as a field technician from December 2004 through December 2005, was essentially identical to Milton's declaration in most respects. As with Milton, Bradley was recruited to work for Networkers by employee Pete Wu; worked exclusively at T-Mobile cell sites servicing Ericsson equipment; signed the Independent Contractor Agreement; was paid hourly; was required to have a specific tool set; was provided with introductory training; was assigned work under the "trouble ticket" system; sometimes travelled long distances to the sites; and was not provided meal or rest beaks during the workday (including

that he believed he would be "fired" if he took a rest break while at a cell site and he would sometimes eat in his vehicle while travelling to the next cell site job). The primary difference in the declarations is that Bradley terminated his relationship with Networkers before Networkers converted its Independent Contractor Agreement into an employment agreement. Additionally Bradley, unlike Milton, stated he understood that Networkers did not consider him to be an employee, but Bradley believed this classification was legally erroneous.

The declaration of the third plaintiff (Jennings) contained substantially similar information as the other two declarations, except that he was assigned to work on EXi cell sites and had more direct customer supervision at the sites. As with Milton, Jennings said he signed Networkers's standard Independent Contractor Agreement, but did not consider himself an independent contractor "as I had always been treated as an employee for the same or similar type of work . . . ." He did not bid on the employment contract or negotiate any of its terms, and Networkers required him and all the other workers to purchase a complete set of tools and then deducted the cost from the workers' paychecks.

With respect to his specific EXi work, Jennings said he was trained by Networkers and EXi on basic tasks specific to the equipment being installed, maintained, and repaired. He then "worked on various sites decommissioning, installing, and re-commissioning equipment . . . ." Jennings said "[t]he travel time to the sites varied and could be as little as 15 minutes or as long as 2 [to] 3 hours. I would learn where the installation site was by email or phone call from a supervisor or whomever was the lead installer for that day. I did not determine where or when I would install a cell site. I would work side by side with other employees to compete the installation." Jennings was required to submit timesheets to Networkers through a computer timekeeping source, and all of the time "had to be submitted to my supervisor for approval." He was not paid premium wages for overtime work, even though he "regularly worked over 40 hours a week and regularly worked more than 8 hours a day . . . ." He said that "[o]n days when the installation took a long time, we were not able to take any meal or rest breaks at all." Jennings also said he "felt pressured by my supervisor to shave my time on certain projects," and was "asked to enter less time for particularly time-consuming tasks. At the end of the day, we would ask the lead how many hours we should all put down for that day's work and whatever he said, we put down, even when that was less than the total amount of time we had actually spent working."

In explaining his daily work, Jennings said: "We were forbidden to leave the site once we started working on the equipment. . . . [¶] . . . Sometimes, a site that we installed that we had got up and running would go back down.

When that happened, we were required to . . . return to the site immediately to get it up and running again. Typically, we were not allowed to put down the hours we spent on the call-back work on the site. [¶] . . . [¶] . . . Networkers employed supervisors, alongside EXi supervisors, to manage employees in the field working on cell sites. While supervisors may not be at each cell site location, a supervisor was always available by telephone should I need assistance with a cell site problem."

Plaintiffs also submitted the declarations of two putative class members, Ernie Garcia and Shane Pinkston, each of whom worked as Networkers field technicians in 2005, and primarily worked at T-Mobile/Ericsson cell sites. Their declarations were similar to the plaintiffs' declarations, reflecting the same form of recruitment, work assignment process, working hours and conditions, and supervision levels. As with Bradley, these individuals terminated their relationship with Networkers before Networkers recharacterized its workers as employees. As with Milton, both stated they did not fully understand the distinction between an independent contractor and an employee. Identical to each plaintiff, Garcia and Pinkston each asserted he was not given meal or rest breaks, and believed he would be "fired" if he took rest breaks while at a cell site and would sometimes eat in his vehicle on the way to the next cell site destination.

Plaintiffs additionally submitted the declaration of their counsel, who said the three plaintiffs were chosen to represent the class because their claims were typical of the claims of all workers employed under the same Independent Contractor Agreement, each of whom performed similar technical work and were subject to identical management policies. In addition, plaintiff Milton "was chosen to represent those persons who Networkers reclassified in January 2006 from 'independent contractor' to 'employee' even though their job duties did not in any way change." Counsel said that 98 of the 140 putative class members worked exclusively under the Independent Contractor Agreement, and the remaining class members were in the same position as Milton, i.e., initially hired under the Independent Contractor Agreement and then signed a new agreement in January 2006 converting the worker's status to an employee position.

In opposing plaintiffs' class certification motion, Networkers argued the class action was inappropriate because there were numerous individualized issues regarding (1) the number of "trouble tickets" or job assignments performed by each class member; (2) the level of supervision of each class member; and (3) the different job responsibilities performed for different clients. In support, Networkers relied on plaintiffs' declarations and portions of plaintiffs' deposition transcripts.

In his deposition testimony, Bradley confirmed that he had understood he was "labeled" an independent contractor rather than an employee. Bradley also stated that generally there was no Networkers supervisor working at the cell sites, or monitoring his work, and the majority of the time he was the only person working at the site. Bradley also agreed that he used his "professional expertise" to fix a problem in the field; the number of assignments that a person worked on each day depended on numerous factors, such as the work location and type of problem; and he would receive "trouble tickets" from Networkers's clients and not directly from Networkers. Milton similarly testified that the time needed to resolve a particular problem varied depending on the task; he was usually the only worker at a cell site fixing the reported problem; and the number of cell sites that he would visit varied each day. In his deposition testimony, Jennings testified that generally the only instructions he received from Networkers before he went to a jobsite was to "show up on time" and "do what they [tell] you to do," and that generally there was a "lead" EXi supervisor on the job telling him what to do, and the time it took to perform each job varied and depended on the nature of the job.

In reply, plaintiffs produced copies of Networkers's payroll data for each putative class member, reflecting the hours each employee worked and the alleged overtime pay violations. Plaintiffs also submitted hundreds of pages of Networkers's discovery responses. In these responses, Networkers (1) admitted it did not pay overtime to its technical service workers (until they were converted into employee status) because they were classified as independent contractors exempt from applicable overtime pay requirements; (2) admitted it did not have rest or meal break policies or maintain records of rest or meal breaks; and (3) stated that because it did not supervise its service workers, it did not know whether the workers took rest or meal breaks and the extent or frequency of such breaks.

After holding a hearing, the court denied plaintiffs' class certification motion. The court stated: "[P]laintiffs have not shown that common questions of fact or law will predominate over individual questions. For example, plaintiffs state, 'The disconnect between the reality of class members' work and the recitations of the [Independent Contractor] contract is so great that it borders on the absurd.' . . . However, there is insufficient evidence that the 'reality' that plaintiffs describe in [their] opening brief was experienced so commonly across the class that common questions of fact or law will predominate over individual questions. Moreover, it appears that the actual existence of damages and/or the manner of incurring damages would differ for individual members of the proposed class." The court declined to rule on each of Networkers's numerous evidentiary objections (spanning 137 pages), stating that "[e]ven if all of [Networkers's] objections were overruled, the Court's ruling would not change."

DISCUSSION

I. *General Legal Principles Governing Class Action Certification*

■ " 'Class actions serve an important function in our judicial system. By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress . . . .' " (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 469 [174 Cal.Rptr. 515, 629 P.2d 23]; see *Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1500 [57 Cal.Rptr.3d 903].) This state's public policy supports the use of class actions to enforce California's minimum wage and overtime laws for the benefit of workers. (See *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340 [17 Cal.Rptr.3d 906, 96 P.3d 194] *(Sav-On)*; *Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1208 [76 Cal.Rptr.3d 804] *(Bufil)*.) Moreover, "the meal and rest period requirements . . . 'have long been viewed as part of the remedial worker protection framework' " and "the relevant wage order provisions must be interpreted in the manner that best effectuates that protective intent." (*Brinker, supra*, 53 Cal.4th at p. 1027.) However, "because group action . . . has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27] *(Linder)*; see *Seastrom, supra*, 149 Cal.App.4th at p. 1500.)

■ "The party seeking certification . . . must establish the existence of an ascertainable class and a well-defined community of interest among the class members. [Citation.] The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Richmond v. Dart Industries, Inc., supra*, 29 Cal.3d at p. 470; see Code Civ. Proc., § 382.) The proponent must show the "class action is superior to individual lawsuits or alternative procedures for resolving the controversy." (*Bufil, supra*, 162 Cal.App.4th at p. 1204; accord, *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 459 [115 Cal.Rptr. 797, 525 P.2d 701].)

■ On the issue whether common issues predominate in the litigation, a court must "examine the plaintiff's theory of recovery" and "assess the nature of the legal and factual disputes *likely to be presented.*" (*Brinker, supra*, 53 Cal.4th at p. 1025, italics added.) The court may consider the elements of the claims and defenses, but should not rule on the merits unless *necessary* to

resolve the certification issues. (*Ibid.*; *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1106 [131 Cal.Rptr.2d 1, 63 P.3d 913]; *Linder, supra*, 23 Cal.4th at pp. 439–440.) "The 'ultimate question' . . . is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker, supra*, at p. 1021.) In conducting this analysis, a "court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Id.* at pp. 1021–1022, fn. omitted.)

Trial courts " 'are ideally situated to evaluate the efficiencies and practicalities of permitting group action' " and therefore are " 'afforded great discretion' " in evaluating the relevant factors and in ruling on a class certification motion. (*Sav-On, supra*, 34 Cal.4th at p. 326; accord, *Brinker, supra*, 53 Cal.4th at p. 1022.) A " 'trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]" [citation]. . . .' " (*Sav-On, supra*, at pp. 326–327.) In determining whether the record contains substantial evidence supporting the ruling, a reviewing court does not reweigh the evidence and must draw all reasonable inferences supporting the court's order. (*Id.* at p. 328.)

## II. Brinker

In *Brinker*, the California Supreme Court applied these general principles to review a trial court's order certifying a class of about 60,000 employees in an action alleging a major restaurant chain owner violated state laws requiring meal and rest breaks for nonexempt hourly employees and requiring accurate recording of employee work time. (*Brinker, supra*, 53 Cal.4th at pp. 1017–1021.) The *Brinker* trial court had certified three subclasses: (1) a class alleging employees were not provided their required 10-minute rest breaks; (2) a class alleging employees were not provided timely and sufficient meal breaks; and (3) a class alleging employees worked "off the clock" (without pay). (*Id.* at pp. 1019–1020.) On appeal, this court held the trial court erred in certifying each of the subclasses and reversed the certification order. (*Id.* at p. 1021.) The California Supreme Court granted the plaintiff's petition for review, and four years later issued an opinion agreeing and disagreeing with various portions of our holdings and analysis, and reaching a different conclusion with respect to each subclass.

First, with respect to the rest break subclass, the *Brinker* court clarified that the applicable wage order requires employers to provide an employee with a 10-minute rest break for shifts lasting three and one-half hours to six hours, and a 20-minute rest break for shifts lasting six hours to 10 hours. (*Brinker, supra,* 53 Cal.4th at p. 1029.) However, under the *Brinker* employer's written rest period policy, the employees were provided only one rest break for every four hours worked (when they should be provided a second break after six hours). (*Id.* at p. 1033.) On these facts, the California Supreme Court held the trial court properly certified the class because "[c]lasswide liability could be established through common proof" showing that "under this uniform policy," the employer "refused to authorize and permit a second rest break for employees working shifts longer than six, but shorter than eight, hours." (*Ibid.*)

█ In finding that common issues predominated on this rest break issue, the high court emphasized that "[c]laims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment," citing with approval three Court of Appeal decisions: *Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286 [105 Cal.Rptr.3d 443] (*Jaimez*); *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524 [87 Cal.Rptr.3d 518] (*Ghazaryan*); and *Bufil, supra,* 162 Cal.App.4th 1193. (*Brinker, supra,* 53 Cal.4th at p. 1033.) In each of these decisions, the Court of Appeal held the trial court abused its discretion in denying class certification based on the predominance issue. (*Jaimez, supra,* at pp. 1299–1307; *Ghazaryan, supra,* at pp. 1534–1538; *Bufil, supra,* at pp. 1205–1206.) These courts reasoned that the plaintiffs were challenging a uniform employment policy that allegedly violated California law and thus this violation could be proved (or disproved) through common facts and law. (*Jaimez, supra,* at pp. 1299–1300; *Ghazaryan, supra,* at pp. 1536–1538; *Bufil, supra,* at p. 1206.) The *Jaimez* and *Ghazaryan* courts further found that common issues predominated even if the policy did not affect each employee in the same way and damages would need to be proved individually. (See *Jaimez, supra,* at pp. 1301, 1303–1305; *Ghazaryan, supra,* at p. 1536.)

█ In analyzing the rest break claims, the *Brinker* court also expressly rejected this court's reasoning that evidence showing some employees took rest breaks and other employees were offered rest breaks but declined to take them made class certification inappropriate. (See *Brinker, supra,* 53 Cal.4th at p. 1033.) The California Supreme Court admonished: "An employer is required to authorize and permit the amount of rest break time called for under the wage order for its industry. If it does not . . . it has violated the wage order and is liable. No issue of waiver ever arises for a rest break that was required by law but never authorized; if a break is not authorized, an employee has no opportunity to decline to take it. As [the plaintiff] pleaded

and presented substantial evidence of a uniform rest break policy authorizing breaks only for each full four hours worked, the trial court's certification of a rest break subclass should not have been disturbed." (*Ibid.*)

 Second, with respect to meal breaks, the *Brinker* court clarified that under the applicable wage order, "an employer's obligation when providing a meal period is to relieve its employee of all duty for an uninterrupted 30-minute period." (*Brinker, supra*, 53 Cal.4th at p. 1038.) Resolving conflicting appellate decisions, the high court held that an employer is not obligated to "ensure" no work is performed during the meal period (*ibid.*), and instead "[t]he employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so" (*id.* at p. 1040). The court further held that "an employer's obligation is to provide a first meal period after no more than five hours of work and a second meal period after no more than 10 hours of work." (*Id.* at p. 1049.) On the certification issue, the court remanded the meal subclass certification issue to the trial court because the trial court applied an erroneous legal standard regarding the timing of meal breaks, i.e., believing that employees were required to be provided a second meal break after a five-hour work period, rather than after working 10 hours. (*Id.* at pp. 1049–1051.)

Third, with respect to the off-the-clock allegations (claims that employees were required to work while clocked out during their meal periods), the court upheld this court's conclusion that the trial court erred in certifying the off-the-clock subclass. (*Brinker, supra*, 53 Cal.4th at pp. 1051–1052.) The California Supreme Court explained that the evidence presented on the certification motion showed that the employer had a lawful policy of *prohibiting* off-the-clock work and the plaintiff did not present evidence "of a systematic company policy to pressure or require employees to work off-the-clock . . . ." (*Id.* at p. 1051.) Without a showing of an allegedly unlawful uniform policy, the high court found the plaintiff had no factual basis from which to argue that the off-the-clock claims could "be shown through common proof." (*Id.* at p. 1052.)

In her concurring opinion, Justice Werdegar provided guidance on remand regarding the missed meal break issues, stating the court does not "endorse" the defendant's argument that the question why a meal period was missed renders meal period claims "*categorically* uncertifiable." (*Brinker, supra*, 53 Cal.4th at p. 1052 (conc. opn. of Werdegar, J.).) Justice Werdegar stated that if an employer's records show no meal period for a given shift, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided, shifting the burden to the employer to show the meal

period was waived. (*Id.* at p. 1053 (conc. opn. of Werdegar, J.).) Justice Werdegar further stated that "[w]hile individual issues arising from an affirmative defense can in some cases support denial of certification, they pose no per se bar [citations]." (*Id.* at pp. 1053–1054 (conc. opn. of Werdegar, J.), fn. omitted.)

### III. *Summary of Issues and Conclusions in This Appeal*

A predicate legal issue underlying Networkers's liability to the class members is whether plaintiffs were independent contractors or employees. The trial court found the work differed among the class members and therefore plaintiffs did not prove common questions would predominate on this legal issue. In our prior opinion, we found insufficient evidentiary support for this conclusion. Although there were certain differences in the class members' particular jobs, we determined these differences were largely irrelevant to the legal issue of whether the worker was an employee or an independent contractor.

In this opinion, we reiterate and adhere to this conclusion. Neither party suggests, nor have we independently found, any aspect of *Brinker* that would support a different analysis or conclusion. *Brinker* instructs that in determining whether common or individual issues predominate, a court must focus on the plaintiff's theory of recovery and assess the nature of the legal and factual disputes likely to be presented under this theory. Applying this analysis, we again determine that the trial court erred in concluding that individual issues are likely to predominate on the independent contractor/employee issue.

But this determination does not resolve the appellate issues before us. In our prior opinion, we found that even though common issues would predominate on the independent contractor/employee issues, there were reasonable grounds for the trial court to conclude that individual issues would predominate on issues relating to the existence and amount of damages for each class member and that these individual issues would make a class action unmanageable. In their supplemental briefs, plaintiffs argue that our analysis was inconsistent with various aspects of the *Brinker* decision. Networkers counters that our prior decision is fully consistent with the *Brinker* decision. For the reasons explained below, we agree with plaintiffs' contentions and find that under *Brinker*, the trial court erred in denying plaintiffs' certification motion, except with respect to the claims relating to alleged off-the-clock violations.

### IV. *Independent Contractor Issue*

A foundational legal question underlying Networkers's liability for the wage and hour violations is whether plaintiffs were independent contractors

or employees. If plaintiffs were independent contractors, Networkers was not required to comply with rules governing overtime and meal and rest periods. On the other hand, if plaintiffs were employees, plaintiffs are likely to prevail on at least some of their claims because Networkers has admitted it did not comply with wage and hour laws applicable to employees.

■ *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*) sets forth factors for determining whether a worker is an employee or an independent contractor.[6] Under this test, a court should evaluate all relevant factors, and the label that the parties attach to the relationship "is not dispositive and will be ignored if their actual conduct establishes a different relationship." (*Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 10–11 [64 Cal.Rptr.3d 327] (*Estrada*).) The determination is one of fact and must be affirmed if supported by substantial evidence. (*Id.* at p. 11; *Borello, supra,* at p. 349.)

■ In *Martinez v. Combs* (2010) 49 Cal.4th 35 [109 Cal.Rptr.3d 514, 231 P.3d 259], filed after our prior opinion, the court clarified the definition of an employer applicable to claims brought under the Industrial Welfare Commission's wage orders to mean " 'any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.' " (49 Cal.4th at pp. 60–66; see wage order No. 14.)

■ Under both the *Borello* and *Martinez* standards, the evidence relevant to the factual question whether the class members were employees or independent contractors is common among all class members. Each of the class members signed a standard Independent Contractor Agreement that characterized the worker as an independent contractor; each class member was engaged in a similar occupation (skilled labor in installing or servicing cell sites); each class member was required to work full time and to be available on every working day and during assigned "on call" times; each class member was told how to prioritize each day's jobs; each class member received hourly pay, rather than pay by the job; each class member submitted timesheets to Networkers and Networkers's customers for approval; and each class member was required to use a specific set of tools on the job and to

---

[6] Those factors include (1) the employer's right to control the means and manner of accomplishing the result; (2) whether the worker is engaged in a distinct occupation or business from the employer; (3) whether the type of occupation is usually "done under the direction of the principal or by a specialist without supervision"; (4) the skill required in the particular occupation; (5) the length of time for which the services are to be performed; (6) the method of payment whether by the time or by the job; (7) whether the parties believe they are creating an employee relationship; and (8) the right to discharge the worker at will. (*Borello, supra,* 48 Cal.3d at pp. 350–351.)

obtain those tools from Networkers. Additionally, although Networkers's standard contract stated that the workers had the right to control the manner and means of the work, including that the workers were permitted to subcontract the work, Networkers had specific time and place job requirements that all workers were required to follow, and the workers could not deviate from these rules or delegate the work.

These common facts would be relevant in each class member's case against Networkers and would constitute the focus of the proof on the independent contractor/employee issue. (See *Estrada, supra*, 154 Cal.App.4th at pp. 13–14 [finding common issues in class action involving question whether workers were employees or independent contractors].) Networkers argued below that there would be a need for individualized proof because of differences among the workers pertaining to job titles, skill levels, pay grades, and the specific type of repair or installation work. However, with respect to the issues "likely to be presented" in the litigation (*Brinker, supra*, 53 Cal.4th at p. 1025), these distinctions are not significant. The fact that some workers engaged in repair work and others engaged in installation work, or that workers had different pay grades or worked for different lengths of time on particular days, is not central to the issue whether the workers here were employees or independent contractors under the *Borello* or *Martinez* tests. (See *Martinez, supra*, 49 Cal.4th at p. 76; *Borello, supra*, 48 Cal.3d at pp. 350–351.) Under the analysis, the focus is not on the particular task performed by the employee, but the global nature of the relationship between the worker and the hirer, and whether the hirer or the worker had the right to control the work. The undisputed evidence showed Networkers had consistent companywide policies applicable to all employees regarding work scheduling, payments, and work requirements. Whether those policies created an employer-employee relationship, as opposed to an independent contractor relationship, is not before us. The critical fact is that the evidence likely to be relied upon by the parties would be largely uniform throughout the class.[7]

Networkers also argued that individualized analysis would be necessary because the class members worked for different customers and some workers were more closely supervised at particular jobsites than were other workers. However, plaintiffs' theory of the case was not that the class members were employees because they were supervised while working at the jobsites. Because of the nature of the job—repair and installation at numerous remote sites throughout Southern California—plaintiffs acknowledged that most class

---

[7] In this regard, Networkers's reliance on decisions involving exempt employees is misplaced. (See *Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440 [56 Cal.Rptr.3d 534]; *Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422 [47 Cal.Rptr.3d 83].) In these cases, the specific nature of the class members' daily tasks was relevant because the issue whether a worker was entitled to overtime depended on the amount of time the worker spent on a particular task.

members were not generally physically supervised by Networkers on technical portions of their jobs and had at least some discretion in the actual performance of the work. Plaintiffs claimed instead that Networkers gave its workers little or no discretion in areas such as responding to the assigned work, prioritizing the work, scheduling the jobs, the amount of payment per job, and selecting the tools with which to work. In considering these claims, the court would be required to address essentially the same legal and factual issues with respect to each class member.

*Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333 [98 Cal.Rptr.3d 568], decided after our prior opinion, is factually distinguishable. There, the defendant taxi company presented evidence showing its control over the plaintiff taxi drivers was not uniform throughout the class because there were material variations in the relationship on numerous factual issues, including whether the class members used the defendant's dispatch service, selected and purchased their own tools and equipment, independently advertised, and/or had control over charged rates. (*Id.* at p. 1349.) Because of these substantial variations, we affirmed the trial court's denial of class certification. There are no similar material variations with respect to the control issue in this case.

We also find unhelpful Networkers's reliance on the fact that the plaintiffs may have had different subjective views of their business relationship with Networkers. The evidence showed that Bradley understood that the relationship was characterized as an independent contractor relationship, but did not believe this was legally correct. The other declarants asserted that they believed they were employees. The difference in this evidence is not legally significant on the class certification issues. Networkers did not produce any evidence that the employees subjectively believed the realities of the job reflected solely an independent contractor relationship.

Viewing the evidence in the light most favorable to the court's ruling, the only reasonable conclusion is that the factual and legal questions would be essentially the same among the plaintiff class members on the independent contractor issue.

### V. *Specific Claims and Damages*

As an alternate basis for its denial of plaintiffs' class certification motion, the trial court found there were substantial individual differences in proof pertaining to damages on the particular claims alleged by plaintiffs. We review each of those claims below.

### A. *Alleged Meal and Rest Break Violations*

Meal and rest break rules are contained in wage orders issued by the IWC. The wage orders are issued on an industry-by-industry basis. (*Brinker, supra*, 53 Cal.4th at p. 1018, fn. 1.) The *Brinker* restaurant employees were governed by wage order No. 5; the telecommunications employees in this case are covered by wage order No. 4. (See Cal. Code Regs., tit. 8, §§ 11040, 11050.) The parties agree the provisions of the wage orders interpreted by the *Brinker* court are identical to the provisions at issue in this case and should be interpreted similarly.

 Generally, an employer must provide an employee a 30-minute meal break for a work period of more than five hours and a second 30-minute meal break for a work period of more than 10 hours per day with certain specified waivers. (§ 512, subd. (a); Cal. Code Regs., tit. 8, § 11040, subd. 11; see *Brinker, supra*, 53 Cal.4th at p. 1049.) An employer also has a duty to authorize and permit rest breaks; the number of breaks depends on the length of the shift. (Cal. Code Regs., tit. 8, § 11040, subd. 12; *Brinker, supra*, 53 Cal.4th at pp. 1028–1031.) "If an employer fails to provide an employee [the required] meal period or rest period . . . , the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided." (§ 226.7, subd. (b).) California employers are required to keep accurate records of meal (but not rest) breaks. (See Cal. Code Regs., tit. 8, § 11040, subd. 7(A)(3).)

On plaintiffs' class certification motion, it was undisputed that (1) Networkers did not have a policy permitting or authorizing meal or rest breaks for the proposed class members; (2) Networkers did not know whether these workers took the required breaks; and (3) Networkers did not maintain any records reflecting when (or if) the workers took meal or rest breaks. The evidence also showed that after Networkers formally converted these workers to "employee" status, it did not implement any rest or meal break policy, or give any notification to the workers about their entitlement to take meal or rest breaks.

Under *Brinker*, plaintiffs' legal challenge to these uniform practices involves common factual and legal issues that are amenable to class treatment. "An employer is required to authorize and permit the amount of [rest and meal] break time[s] called for under the wage order for its industry. If it does not . . . it has violated the wage order and is liable." (*Brinker, supra*, 53 Cal.4th at p. 1033.) Claims alleging a "uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment." (*Ibid.*)

Networkers argues *Brinker* is not controlling because in *Brinker* the plaintiffs challenged an express meal and break policy whereas here plaintiffs are challenging the fact that the employer's *lack* of a policy violated the law. This is not a material distinction on the record before us. Under *Brinker* and under the facts here, the employer engaged in uniform companywide conduct that allegedly violated state law.

In support of their certification motion, plaintiffs presented evidence that under Networkers's uniform practice, none of the workers was provided, or given authorization to take, the required meal or rest breaks. In their discovery responses, Networkers acknowledged it did not have a policy and did not know if the employees took meal or rest breaks. Five workers further submitted declarations confirming that they frequently did not take rest breaks because of the nature of the work and several believed they would be "fired" if they stopped working to take a break. Likewise, these workers' declarations supported that they were not given the type of meal break required under the law—an uninterrupted 30 minutes during which they were free to use their time as they wished.

In response, Networkers did not present *any evidence* showing it had a formal or informal practice or policy of permitting the required breaks or that any worker believed he or she was entitled to take a legally required rest or meal break, or that some or all workers took these breaks. At most, Networkers argued the workers *must have* taken breaks because they worked alone for long periods of time. Further, Networkers did not present any evidence that its meal or break policies (or the failure to institute such policies) were *different* with respect to each worker.

*Brinker* instructs that in ruling on the predominance issue in a certification motion, the court must focus on the plaintiff's theory of recovery and assess the nature of the legal and factual disputes likely to be presented and determine whether individual or common issues predominate. (*Brinker, supra*, 53 Cal.4th at p. 1025.) Here, plaintiffs' theory of recovery is based on Networkers's (uniform) *lack* of a rest and meal break policy and its (uniform) *failure* to authorize employees to take statutorily required rest and meal breaks. The lack of a meal/rest break policy and the uniform failure to authorize such breaks are matters of common proof. Although an employer could potentially defend these claims by arguing that it did have an informal or unwritten meal or rest break policy, this defense is also a matter of common proof. Further, to the extent Networkers believes it can raise issues at trial that some employees took the authorized rest or meal breaks, there was no evidence in the record supporting this defense. Networkers did not present any declarations or deposition testimony suggesting that the required breaks were regularly taken by the workers. Moreover, as *Brinker* made clear,

an employer is obligated to *provide* the rest and meal breaks, *and if an employer does not do so*, the fact that an employee did not take the break cannot reasonably be considered a waiver. "No issue of waiver ever arises for a rest break that was required by law but never authorized; if a break is not authorized, an employee has no opportunity to decline to take it." (*Brinker, supra*, 53 Cal.4th at p. 1033.)

Networkers argues, and we agreed in our initial opinion, that the issue of which employees had missed breaks and how many breaks were missed and whether those missed breaks were the result of Networkers's lack of a break policy was highly dependent on the testimony of each plaintiff, essentially requiring a mini-trial on each class member's case to determine the eligibility for recovery and the amount of damages to which each plaintiff would be entitled.

However, this argument conflicts with *Brinker*'s clear holdings that for meal breaks, an employer has an obligation to relieve its employee of all duty, permit the employee to take an uninterrupted 30-minute break, and to not impede or discourage the employee from doing so. (*Brinker, supra*, 53 Cal.4th at p. 1040.) Similarly, an employer has an obligation to provide a rest break, and if the employer fails to do so, the employer cannot claim the employee waived the break. (*Id.* at p. 1033.) Under the logic of these holdings, when an employer has not authorized and not provided legally required meal and/or rest breaks, the employer has violated the law and the fact that an employee *may* have actually taken a break or was able to eat food during the workday does not show that individual issues will predominate in the litigation.

This principle is illustrated by the facts and holding in *Jaimez*, a case filed after our original opinion and cited with approval by the *Brinker* court. (*Jaimez, supra*, 181 Cal.App.4th 1286.) In *Jaimez*, as here, the workers were on the road for most of the day and performed services at the customers' places of business. (*Id.* at p. 1290.) The plaintiff brought a class action on behalf of about 247 putative class members, alleging the employer failed to pay overtime and failed to "permit or authorize" required meal and rest breaks. (*Id.* at pp. 1291–1292.)

In support of class certification, the *Jaimez* plaintiff submitted class member declarations showing the employees engaged in the same service-type duties (although for different customers), they were subject to the same uniform pay and meal break policies set forth in the handbook, the employer regularly failed to pay overtime pay, and the nature of the employer-assigned routes and duties resulted in the workers often working more than eight hours per day without taking required uninterrupted meal and/or rest breaks.

(*Jaimez, supra,* 181 Cal.App.4th at pp. 1293–1294.) The evidence also showed the employer had regularly deducted 30 minutes per shift for meal breaks even if no break was taken, and/or required employees to sign a manifest indicating they took a meal break even if they did not take the break. (*Id.* at pp. 1294–1295.) In opposing the certification motion, the employer submitted declarations from 25 putative class members, contradicting some of the employees' factual assertions, including stating that they were always allowed and encouraged to take meal breaks and that they had time to take them. (*Id.* at p. 1295.) The trial court denied certification finding that "common questions of law and fact did not predominate because [the defendant's] evidence demonstrated a strong indication of conflicting testimony at trial, which therefore precluded a finding of common questions of fact" and "a class action was not the superior method for adjudicating the claims in the complaint given the lack of commonality and typicality and thus the corresponding need for individualized inquiry." (*Id.* at p. 1296.) The trial court further expressed concern that it would be difficult to identify a plaintiff who would be typical of the class because " 'some of them state they got meal breaks, they got rest breaks' " and others said they did not. (*Ibid.*)

Reversing the trial court's order, the *Jaimez* court found the trial court "misapplied" the law regarding class certification by "focusing on the potential conflicting issues of fact or law on an individual basis, rather than evaluating 'whether the *theory of recovery* advanced by the plaintiff is likely to prove amenable to class treatment.' " (*Jaimez, supra,* 181 Cal.App.4th at p. 1299.) The court stated that "had the trial court focused on the correct criteria, it would have necessarily found the [defendant's] declarations, while identifying individual effects of policies and practices that may well call for individual damages determinations, nevertheless confirm the predominance of common legal and factual issues that make this case more amenable to class treatment." (*Id.* at p. 1300.) The court further held "[t]he fact that individual [workers] may have different *damages* does not require denial of the class certification motion." (*Id.* at p. 1301.)

As in *Jaimez,* there were common factual and legal issues in this case regarding whether the employees were permitted to take meal and rest breaks and whether they were compensated for missed meal and rest breaks. The evidence also showed that the nature of Networkers's scheduling and work requirements made it difficult for employees to take required rest and meal breaks. Focusing on the employees' allegations that the employer's company-wide employment practices violated state law, the *Jaimez* court found the fact that the evidence may disclose that not all employees missed a meal or rest break does not mean that individual issues would predominate on the liability issues. (*Jaimez, supra,* 181 Cal.App.4th at pp. 1300–1301.) Applying the principles set forth in *Brinker,* we reach the same conclusion in this case.

██ Moreover, to the extent the amount of damages may require individual proof, *Brinker* reconfirmed that " 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker, supra*, 53 Cal.4th at p. 1022; accord, *id.* at p. 1054 (conc. opn. of Werdegar, J.) ["[w]e have long settled that individual damages questions will rarely if ever stand as a bar to certification"]; *Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 216 [145 Cal.Rptr.3d 340]; *Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 941 [124 Cal.Rptr.3d 565].) " 'Predominance is a comparative concept, and "the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate." ' " (*Sotelo v. Medianews Group, Inc.* (2012) 207 Cal.App.4th 639, 652 [143 Cal.Rptr.3d 293] (*Sotelo*).)

In reaching our conclusions in this case, we find unhelpful Networkers's reliance on *Sotelo, supra*, 207 Cal.App.4th 639, a case filed after the high court filed its *Brinker* decision. In *Sotelo*, the plaintiff class consisted of adults and minors who were hired to fold, bag, and deliver newspapers and/or to supervise others in these activities. These plaintiffs sued a group of about 30 "interconnected newspaper publishers and conglomerates" alleging the defendants misclassified the workers as independent contractors and violated various employment laws, including that the workers were not given legally required meal/rest breaks. (*Id.* at pp. 644–645.) The factual record showed the nature of the putative class members' work differed substantially in terms of control, entitlement to meal/rest breaks, and overtime, particularly because some of the class members hired other individuals to perform the work and other class members performed the work themselves. (*Id.* at pp. 644–647.)

On this record, the *Sotelo* court held the trial court did not err in finding the class was not ascertainable and common issues did not predominate on the independent contractor issue *or* on matters relating to the individual claims. (*Sotelo, supra*, 207 Cal.App.4th at pp. 647–656.) With respect to the individual claims, the court found there was no evidence defendants had a common policy applicable to all employees that allegedly violated state law (*id.* at pp. 654–655) and plaintiffs had made no effort to satisfy the predominance element with respect to the specific claims (*id.* at p. 652). This is very different from the circumstances here where the plaintiffs alleged, and produced specific evidence, showing the existence of a common practice (the failure to authorize and provide for meal and rest breaks) that violated state law. Further, in *Sotelo* many of the workers employed other individuals to perform the required tasks and this information was not necessarily reflected in the employment records. Thus, unlike here, there was no simple or

common method to prove whether each class member worked sufficient hours to be entitled to rest and/or meal breaks.[8]

This case is also factually distinguishable from other post-*Brinker* decisions upholding the denial of class certification on meal/rest break claims. (See, e.g., *Tien v. Tenet Healthcare Corp.* (2012) 209 Cal.App.4th 1077 [147 Cal.Rptr.3d 620].) In *Tien*, there was "overwhelming" evidence that the employer "made meal periods available to employees," and the evidence of the employer's liability to each employee depended on numerous individual issues regarding the employee's particular situation. (*Id.* at pp. 1084, 1087, 1090.)[9]

### B. *Alleged Overtime Wage Violations*

Plaintiffs also challenge the court's refusal to certify the class on their claims that Networkers failed to pay overtime wages.

An employer is required to pay its employees 1.5 times the usual hourly wage for work in excess of eight hours per day or 40 hours per week, and two times the usual wage for work in excess of 12 hours. (§ 510, subd. (a); see Cal. Code Regs., tit. 8, § 11040, subd. 3(A).) Networkers admitted it paid no overtime wages to any class members from December 2004 through December 2005. Thus, if plaintiffs prove they were employees, the fact that Networkers did not pay overtime wages is a common issue that can be proved classwide.

---

[8] As in *Sotelo*, another court very recently upheld the lower court's refusal to certify a class of home delivery newspaper carriers. (*Ayala v. Antelope Valley Newspapers, Inc.* (2012) 210 Cal.App.4th 77 [148 Cal.Rptr.3d 138].) In *Ayala*, the reviewing court found the independent contractor/employee issue was subject to common proof and thus amenable to class treatment, but upheld the lower court's refusal to certify the class on the plaintiffs' overtime, meal break, and rest break claims because of plaintiffs' failure to show common issues would predominate on these claims. (*Id.* at pp. 91–94.) The *Ayala* court stressed that the plaintiffs did not in their moving papers "address commonality as to any issues related to their causes of action other than the independent contractor/employee issue . . . ." (*Id.* at pp. 92–93.) This case is distinguishable. Plaintiffs here presented declarations and payroll evidence supporting the existence of common proof on the meal/rest break claims.

[9] In its supplemental appellate brief, Networkers argues at length that the law does not require an employer to provide a *written* meal or rest break policy. However, plaintiffs' allegations concern the absence of any policy, not merely a written policy. Moreover, as *Brinker* instructs, a court should not address the merits of a claim in examining a class certification motion unless necessary. It is not necessary for this court to address the issue whether a written meal and/or rest break policy is legally required.

In a petition for rehearing, Networkers argues that the trial court erred in failing to specifically rule on each of its 227 evidentiary objections. However, by failing to raise and/or develop this contention in its appellate briefs, Networkers has waived the argument. Additionally, contrary to Networkers' assertions in its rehearing petition, nothing in this opinion is intended to expand an employer's rest break obligations beyond the standards discussed by the *Brinker* court.

■ Networkers argues the *amount* of overtime pay damages potentially due each class member requires individualized analysis because the number of hours worked each day was not uniform. Plaintiffs counter that this issue would not be a predominant issue in the litigation because it is a simple task to calculate the damages based on the payroll records that have been produced by Networkers. We agree. The existence of time records showing the amount of hours worked by each employee could provide a reasonable and straightforward basis for a court to award damages for failure to pay overtime wages. (See *Employment Development Dept. v. Superior Court* (1981) 30 Cal.3d 256, 266 [178 Cal.Rptr. 612, 636 P.2d 575] ["a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery or as to the amount of his or her damages"]; accord, *Brinker, supra*, 53 Cal.4th at pp. 1021–1022; *Sav-On, supra*, 34 Cal.4th at p. 333; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 746–751 [9 Cal.Rptr.3d 544].)

Networkers nonetheless argued below that the overtime pay issue was inextricably linked with plaintiffs' claims that they were unlawfully pressured by their supervisors to underreport their hours and their claims that they were not permitted to fully record travel and waiting times. Networkers asserted that because this underreporting did not occur on a consistent basis and was dependent on the particular job and the particular worker, to accurately determine the entitlement and amount of overtime pay for work that was never recorded, each of the class members would be required to testify, and Networkers would be entitled to present the testimony of the various individual supervisors, requiring numerous mini-trials on the factual issues regarding if and when the compelled underreporting occurred.

In our prior opinion, we found this argument provided a sufficient basis for the court to have exercised its discretion to deny certification on the overtime claim. However, on our review of the *Brinker* decision, we conclude there is no reasonable basis to merge the two issues into one single claim for the purpose of class certification *on the overtime claim*. (See *Brinker, supra*, 53 Cal.4th at p. 1051 [reaching different conclusions on meal break claim and claim that employees were required to work off the clock during meal periods].) The undisputed evidence shows the Networkers technicians regularly worked more than eight hours per day and more than 40 hours per week. The undisputed evidence further shows these workers were paid no overtime wages until they were converted to employee status. Assuming these workers were employees (and not independent contractors), proof of the damages would be a simple matter of directly calculating the outstanding amounts owed from the pay records. Plaintiffs presented these pay records in support of their class certification motion. To the extent that certain workers were compelled to work off the clock and this off-the-clock work was required to

be paid at premium overtime wages, as discussed below this is a separate issue that can be considered separately from the overtime claim.

### C. Off-the-clock Claims

Plaintiffs contend the court erred in failing to certify the class on their claims that Networkers violated state law by requiring class members to work at certain times but not allowing them to record the work time ("off-the-clock" claim). We reject this contention on the record before us.

The factual record does not necessarily show Networkers had a uniform policy requiring each employee to work off the clock. Instead, there is evidence supporting that the off-the-clock claims arose from individual actions of particular supervisors and the extent of the off-the-clock work varied substantially for each worker and for each job. Thus, on the record before us we cannot conclude that the court abused its discretion in denying certification on this claim.

However, because the factual and legal landscape has changed based on our reversal of the class certification ruling on the overtime and rest/meal breaks, and it is not clear that the court considered the off-the-clock issues separately from the overtime claim, the prudent course is to remand this issue for the trial court's reconsideration. In so doing, we decline to rule on plaintiffs' contention that the off-the-clock violations may be proved by the use of representative testimony, surveys, and statistical methods. This contention involves factual questions regarding manageability and fairness that should be considered by the trial court in the first instance.

### D. Remaining Claims

In addition to their causes of action for failure to pay overtime wages, violations of meal and rest break laws, and working off the clock, plaintiffs also brought claims for (1) failure to furnish accurate wage statements; (2) failure to keep accurate payroll records; (3) waiting time penalties; and (4) unfair business practices. To the extent these claims were based on plaintiffs' overtime and/or meal and rest break claims, the court should have granted class certification on these claims. To the extent these causes of action are based on the off-the-clock claims, the court should reconsider its ruling based on this opinion and *Brinker*.

## DISPOSITION

Order reversed and remanded with directions. The parties to bear their own costs on appeal.

McConnell, P. J., and McDonald, J., concurred.

A petition for a rehearing was denied January 8, 2013, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied March 20, 2013, S208161.