Filed 5/30/13  Nelson v. Southern Cal. Gas CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| ERIC L. NELSON et al., | B238845 |
| Plaintiffs and Appellants, | (Los Angeles County |
| v. | Super. Ct. No. BC451310) |
| SOUTHERN CALIFORNIA GAS COMPANY, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Zaven V. Sinanian, Judge.  Affirmed in part, reversed in part.

Marlin & Saltzman, Louis M. Marlin, Kristen Marquis Fritz; Fitzgerald Lundberg & Romig, Ken M. Fitzgerald and Barbrae Lundberg for Plaintiffs and Appellants.

Paul Hastings, Paul Grossman, Paul W. Cane, Jr., Leslie L. Abbott, Eric Stevens; Young, Zinn & Bate, Linda Van Winkle Deacon and Harry A. Zinn for Defendant and Respondent.

_____

Plaintiffs Eric Nelson, Juan Mejoredo, and Robert Dowling sought certification of a class action against Southern California Gas Company (the Gas Company). The plaintiffs alleged the company failed to provide meal and rest breaks in accordance with California law, and committed overtime wage violations. The trial court denied certification on the grounds that the plaintiffs failed to establish common questions would predominate in the action or that class treatment would be the superior means of resolving the litigation. We affirm the trial court order on class certification but reverse the order to the extent it purported to deny plaintiffs' representative claim under the Labor Code Private Attorney Generals Act of 2004 (Lab. Code, § 2698 et seq.; PAGA).

## FACTUAL AND PROCEDURAL BACKGROUND

Named plaintiffs Nelson, Mejoredo, and Dowling worked as "field operations" employees for the Gas Company. Field operations employees work in the "field," away from a Gas Company facility, driving in company vehicles in assigned geographic areas or at specific sites. In their class action lawsuit, plaintiffs alleged the Gas Company violated California wage and hour laws by failing to relieve class members of all duties during their meal and rest periods, and by exerting control over class members during their meal and rest periods, such that they were denied the meal and rest breaks required by law. Plaintiffs also alleged the Gas Company required class members to perform work "off the clock," such as donning and doffing coveralls, and booting up or shutting down computers. Based on these factual allegations, plaintiffs asserted seven causes of action in the operative second amended complaint: (1) failure to provide required meal and rest breaks in violation of Industrial Welfare Commission (IWC) Wage Order No. 4 (Wage Order No. 4), and Labor Code sections 200, 226.7, and 512;[1] (2) failure to compensate for all hours worked (Wage Order No. 4; Lab. Code, §§ 200, 226, 226.7, 500, 510, 1194, 1197, 1198); (3) failure to pay overtime compensation (Lab. Code,

---

[1]     All further statutory references are to the Labor Code unless otherwise noted.

        On our own motion, we have augmented the appellate record with the second amended complaint.

§ 1194); (4) failure to compensate for all hours worked (Wage Order No. 4; Lab. Code, §§ 200, 226, 226.7, 500, 510, 1194, 1197, 1198); (5) failure to furnish accurate wage statements (Lab. Code, § 226); (6) failure to pay compensation upon discharge (Lab. Code, §§ 201-203); and (7) violations of Business and Professions Code section 17200 et seq. (UCL). Plaintiffs also asserted a claim for remedies under PAGA.

The Gas Company filed a motion for an order declaring the suit inappropriate for class treatment and denying representative status for the PAGA claim. Plaintiffs subsequently filed a motion for class certification. Plaintiffs sought certification of a class defined as: "All individuals who are currently employed, or formerly have been employed, as non-exempt Field Operations employees for Southern California Gas Company during the Class Period. Excluded from the Class are Meter Readers and current and former employees who work only at a base location (as opposed to in the field) including, but not limited to, Field Planners." Plaintiffs also sought certification of two subclasses, one composed of class members whose employment required them to wear employer-supplied coveralls and other protective gear, and one composed of class members whose employment had been terminated.

**Motion for Certification**

In the certification motion, plaintiffs argued the Gas Company had formal policies that were applied to all field operations employees, and these policies established the Gas Company was not providing lawful meal and rest breaks and required "off-the-clock" work. They offered documentary and testimonial evidence in support of the motion, which we summarize below.

*Written Policies*

Plaintiffs provided copies of the Gas Company's written policies, including an Employee Conduct and Responsibilities manual with an effective date of September 2006. On company vehicles, the manual provided that company vehicles are "operated only in the performance of Company business by authorized employees who are 18 years of age or over." In a section on work assignments, the manual indicated field employees are required to "retrieve and route their orders on or after the start of their shift. . . . [¶]

3

. . . Employees are expected to be in their assigned work area unless otherwise approved by a supervisor. Travel between work areas is by the most reasonably direct, and efficient route."

The manual included a section on work schedules, coffee breaks, and lunch periods. The section provided that field employees are entitled to take two 10-minute breaks and, when working more than six hours in a given day, the employee is required to take a meal period before the end of the fifth hour of work.[2] This section also stated: "Field employees may carry coffee, tea, milk etc., and take a rest period as work permits. Coffee and other beverages are not prepared on the job. . . . [¶] . . . Field employees are to avoid coincidental meetings of more than two persons or more than one crew. Prearranged meetings are prohibited."

In a section of the manual titled "Conduct," the document indicated company coveralls and uniforms "are worn only in the performance of Company work or Company-approved activities. Two-piece uniforms may be worn to and from work." The manual indicated employees are prohibited from consuming alcoholic beverages during working hours, "whether on or off of Company premises."

Plaintiffs also offered subsequently revised manuals containing similar provisions to those identified above. A copy of the manual with a February 2011 revision date indicated coveralls and two-piece uniforms could be worn to and from work, and stated employees were allowed to take uniforms or coveralls home if required to report to work with a uniform or coveralls. Plaintiffs' evidence also included copies of a provision from the collective bargaining agreement stating certain employees would be provided coveralls, and employees would not take the coveralls home at night except in specified circumstances.

Plaintiffs attached a separate "gas standard" for crew operations which set forth rest period criteria. The standard allowed for crew operations employees to take rest

---

[2] This section also included guidelines for meal periods when an employee works more than 10 hours in a shift.

4

periods or coffee breaks, with the "Lead Construction Technician's approval, when the entire time away from the job does not exceed 15 minutes nor more frequent than one morning and one evening break and: [¶] . . . May be taken en route to the first job or to the base following the last job, if the travel time exceeds 1-1/2 hours or, [¶] . . . They drive by or stop near a restaurant or store en route to their next job by a direct route, provided parking space is available nearby and the stops are of short duration or, [¶] . . . When working within a reasonable walking distance of a restaurant or store. One or two crew members at a time may leave the job to obtain coffee or soft drinks. The crew truck is not left unattended nor used for transportation in these cases or, [¶] . . . A 'coffee truck' stops at or nearby the job location." The policy further indicated an employee was permitted to carry a beverage and take a short coffee break as the work permitted, but noted, "It is not intended, however, that coffee or other hot or cold drinks be prepared on the job."

*Declarations of Named Plaintiffs and Arturo Frias*

The named plaintiffs declared Gas Company policy required them to be available at all times during their shifts to respond to emergencies, including during meal and rest breaks. Plaintiffs further declared Gas Company policy required that if field operations employees are contacted, including during a meal or rest break, the employee is required to acknowledge the contact to determine whether it is an emergency. Plaintiffs additionally declared Gas Company policy required field operations employees to be in their assigned work area unless they had supervisor approval to be out of the area; they were required to always be "in route" during their work shifts; they were required to drive a company vehicle but were not allowed to use the vehicle during meal and rest periods; they could only take rest breaks as "work permits"; and they were prohibited from having prearranged or coincidental meetings of more than two persons or more than one crew of workers. Nelson declared he was disciplined in 2004 for being "out of route" and using a Gas Company truck for transportation during a lunch break. Plaintiffs declared Gas Company policy prohibited field operations employees from consuming alcoholic beverages during working hours, and two of the named plaintiffs also declared

5

that under Gas Company policy they were not allowed to prepare coffee or other beverages on the job site. According to plaintiffs, they were prohibited from taking their coveralls home, but were also required to wear them only when working. They additionally declared they were required to perform work-related duties before and after their scheduled shifts, and they were not paid for the time.

Plaintiffs' evidence included the declaration of a union representative, Arturo Frias. Frias declared, based on his personal knowledge and disciplinary records he had seen, that he was aware Gas Company employees had been disciplined for being out of route, using company vehicles during their meal and rest periods, having coincidental or prearranged meetings during meal or rest periods, consuming alcoholic beverages during meal or rest periods, taking coveralls home, and for not responding to calls from supervisors or dispatch during a shift.

*Deposition Testimony of Gas Company Supervisors*

Plaintiffs offered excerpts from the depositions of 13 Gas Company supervisors. The supervisors all testified that one of their responsibilities was to enforce company policies, or to review the company's policies with the employees they supervised to ensure compliance. Several supervisors testified that the employees they supervised used company vehicles equipped with a communication device or radio that allowed employees to be contacted. Several confirmed that the company trucks were equipped with a horn that could be remotely honked if the radio was not answered. There was also testimony that employees used mobile data terminals, a form of laptop computer.

In the included excerpts, the supervisors testified that employees had to be reachable at all times while "on duty," or available to be contacted by some method in case of an emergency. One supervisor testified if there was an emergency during work hours, one of two types of field employees would respond, but there was no particular time frame because "all emergencies are different." Another testified if an employee received a contact during a meal break, the employee would respond if it was an emergency and, once the area is made safe, the employee would start the lunch or break.

6

Others testified if it was not possible to restart the meal period, the employee would receive an extra hour of pay.

Regarding the policy that employees stay "in route," 10 of the supervisors testified this meant going from one job to the next, and not going somewhere that was not on the way, or not deviating from the most direct route to the job site, or taking the "most efficient" route. One supervisor testified that employees were told to stay "en route," but not that there was "a certain mileage you can go before we call you out of route." Five supervisors testified they were aware an employee could be disciplined for not staying in route.

*Deposition Testimony of Gas Company Person Most Knowledgeable Witness*

Plaintiffs further supported their motion with excerpts from the deposition of a person most knowledgeable (PMK) witness for the Gas Company, Frank Ayala. Ayala testified that employees were supposed to take a meal break in the "general proximity of where their last order is or their next order." Ayala indicated there was no written policy defining in or out of route, or any set distance or mileage determining what is "in route," but the company relied on the employee's "good judgment," and "coaching" from supervisors, who also used their judgment to determine "reasonable proximity." Ayala testified employees were allowed to conduct personal business on meal and rest breaks. He said when there was an emergency call, employees were required to respond "as quickly as they can safely respond when they are given the work." He testified employees with various job titles were to be available at all times to respond to emergencies during their shifts. Although the company tried to avoid interrupting an employee's meal or rest breaks, "if it is an emergency and they are the closest person," an employee taking a meal or rest break might be interrupted by an emergency call, and could be subject to disciplinary action for failing to respond.

**Gas Company Opposition**

The Gas Company contended class treatment was inappropriate because some of the plaintiffs' theories were legally untenable, and their claims would require individualized proof.

7

*Putative Class Member Declarations*

To support the motion seeking an order declaring the action inappropriate for class treatment, and in opposition to plaintiffs' certification motion, the Gas Company submitted declarations from 58 field operations employees. Some declarations were short preprinted forms, with spaces for the employees to mark responses by hand. The form declarations addressed how frequently the employee wore coveralls, whether she or he was permitted to take the coveralls home, and whether he or she was required to change into coveralls at the base before clocking in for a shift, or required to change out of coveralls at the base after clocking out for the day. Most declarants indicated they were permitted to take their coveralls home. Some, but not all, indicated they were required to change into coveralls at the base before they were clocked in for the day. Most reported they were not required to change out of coveralls at the base after clocking out for the day.

The form also addressed meal periods, allowing the declarants to indicate how frequently they were able to take a "duty-free 30-minute meal period within 5 hours of starting work," and whether or how often they were allowed to leave the job site for a meal period. With respect to occasions when the employee took a meal period at the job site, the declarations asked employees to assess the percentage of time that was the employee's free choice, because a member of management said the employee had to remain at the site, because of an emergency, or for another reason. There was a range of responses. One declarant reported only being able to take a duty-free meal period 45 percent of the days he worked. Some declarants indicated they were able to leave the job site for a meal on only 5 percent of the days they worked. However, others reported being able to take duty-free meal periods 100 percent of the days they worked, and they were able to leave the job site 100 percent of the time.

The Gas Company's declarations also included longer prose-style declarations addressing meal and rest periods. These declarations contained text indicating the Gas Company had never pressured the employee to skip meal or rest periods, and the employee was allowed to place active orders on hold to take a meal period. The

8

declarations included language indicating how often the employee had the opportunity to take an "off-duty meal period of at least 30 minutes," whether the employee always decided when and where to take meal and rest periods, and whether the employee understood the Gas Company expected the employee to accurately record meal period start and stop times. Some declarants recounted receiving premium pay on occasions when they were unable to start a meal period within 5 hours of starting work. One individualized paragraph described how the employee usually spent his or her meal and rest periods, most included the sentence: "I am allowed to leave my work vehicle unattended during meal and rest periods as long as I lock it." Some employees stated they brought lunch from home and sat in the truck or in a park to take the meal break. Others described buying a meal and taking a meal break outside of the truck, or taking a "reasonable detour" between orders to take a break. Several declared they usually took rest breaks at fast food restaurants or stores.

Some of the longer declarations also described a process by which the employee could keep track of an interrupted meal period so as to be paid for the time. Several included a paragraph indicating that when the declarant received a message during a meal period to respond to an emergency call, he or she interrupted the meal, recorded the interruption, and responded to the emergency. Numerous declarants also stated if the interruption was not for a particular type of emergency (an "A-1 leak order"), they could ignore the message and respond after the meal break, or tell the dispatcher they were on lunch and they would not be disturbed.[3] Some included a paragraph stating they would send a message to the dispatcher notifying him or her that they were starting a meal period so they would not be contacted during that time. A few declarants noted they did not always carry a communications device with them when they were on meal or rest breaks.

---

[3] Some declarants indicated they were rarely interrupted during their meal breaks. Others were silent on how often they were interrupted.

The declarations further discussed the policy regarding Gas Company uniforms; most indicated they were allowed to take their uniforms home and had the option to change in and out of uniform at home. Many declarants in these longer declarations indicated no Gas Company management had ever told them they needed to change into or out of a uniform or coveralls at the base before or after their shift. With respect to coveralls, many declared they did not always wear coveralls and changed into and out of them on paid working time.

*Gas Company Supervisor Declarations*

The Gas Company additionally provided declarations from 12 supervisors who worked at different bases, all of whom plaintiffs had deposed. These declarations suggested supervisors at different bases had different expectations about what communication devices employees were required to carry, if any.

Many of these supervisors declared they had rarely or never called employees on their cell phones or paged employees during meal or rest breaks to have the employee respond to an emergency. Eleven of the twelve declared that when they called employees, they always asked if they were available, and, if the employee was on a meal or rest break, they told the employee they could return the contact after the break was finished. All declared they had never disciplined an employee for failing to respond to a call or a page.[4] Some supervisors declared that if they (personally, or through dispatch) contacted an employee about an emergency, they made known whether it was an emergency that required an immediate response or one that could be handled after a break or ongoing order.

The supervisors further explained the customary practices at their bases regarding the definition of "in route," the personal use of company vehicles during meal and rest breaks, the prohibition on preparing coffee, and the prohibition on meetings of two or more employees. Some supervisors interpreted "in route" as allowing employees to use a

---

[4] The declarations did not discuss how frequently employees failed to respond to calls or pages, if at all.

10

company vehicle to drive "a few minutes" or "a few blocks" out of "the most direct route between two orders," or to take a "reasonable detour," or to take a "a reasonable detour . . . as long as they are heading in the same direction as their next order." Several of the supervisors indicated employees could take their breaks anywhere they wanted "within the break timeframe." Two indicated their employees were allowed to drive company vehicles "farther out of the most direct route . . . during breaks if that is how they choose to spend their time."

All of the supervisors declared employees "routinely" used company vehicles between work orders to drive to locations such as restaurants, convenience stores, or "other locations," to take their meal or rest breaks. All declared they had never disciplined an employee for using a company vehicle to drive to a location in their assigned geographic area to take a meal or rest period.

Most, but not all, of the supervisors declared there was no prohibition on coffee preparation at their bases during meal or rest periods.[5] All noted that the issue had never come up because employees "prefer to stop at a local coffee shop or bring beverages from home," or in some cases took coffee provided at the base. All of the supervisors acknowledged the company's prohibition on prearranged or coincidental meetings.

All but one of the supervisors declared the requirement that company attire only be worn when performing work did not apply to employees during meal and rest breaks, and employees were allowed to wear uniforms or coveralls during those times. All but one further declared employees were free to wear their coveralls and uniforms to and from work. All but one of the supervisors declared that employees often returned to the base to shower and change out of their work clothes while on the clock, assuming they were able to finish in the field before the scheduled end of their shifts. In addition, they all declared that employees were not required to boot up computers before the start of a

---

[5] One noted there was no prohibition on preparing coffee so long as employees did not use a "blow torch or other device to heat their beverage."

11

shift; all but one further declared employees were not required to omit the time it takes to shut down the computer from their time sheets.

The Gas Company's evidence also included an excerpt from the PMK deposition, in which Ayala testified: "I am not aware of specific restrictions [on what employees can do during their meal and rest break times] other than they are not supposed to be traveling long distance on a route. They are supposed to take an uninterrupted meal break in the general proximity of where their either last order is or their next order. [¶] . . . [¶] . . . They get a certain number of orders in a certain geographic area. And they are expected to stay in that geographic area and take their meals within a reasonable proximity of those orders." The Gas Company also included excerpts from several supervisor depositions, in which the supervisors testified they were unaware of the collective bargaining provision prohibiting employees from taking coveralls home.

**Trial Court Ruling**

The trial court denied the motion for class certification. Although it concluded plaintiffs had established the proposed class was ascertainable and sufficiently numerous, and that the named plaintiffs would be adequate representatives, the court determined common questions would not predominate in the litigation of the class claims. The court found the evidence demonstrated the Gas Company's policy was for field employees to receive messages, even during breaks. However, the court explained there was no set time in which employees were required to respond, and some employees did not respond during their meal breaks. The court therefore concluded "whether a class member actually responded to a message during their meal break is a question that cannot be determined on a classwide basis because of variations in practice." The court dismissed plaintiffs' arguments regarding the prohibition on alcohol consumption and preparation of hot beverages as irrelevant.

As to the "in route" restriction, the court concluded the Gas Company policy involved no specific geographic limitation and each supervisor was able to determine what was reasonable. As a result, the court concluded "[w]hether the requirement that the class members stay 'en route' amounts to such a restriction that Defendant remains in

12

control of their meal breaks, cannot be determined for the entire class and would require individualized analysis. In other words, there are differences in how the rule is applied by supervisors that would create individualized questions for putative class members."

The court determined plaintiffs did not provide evidence that a rule against conducting personal business during meal breaks was uniformly applied to the class. Similarly, the court concluded the plaintiffs had not established a rule prohibiting meetings of more than two persons or more than one crew was applied to the class because the plaintiffs provided only their own declarations as evidence. The court concluded these three issues—whether class members' meal breaks were interrupted by messages to which they responded or did not respond to; the application of a rule against personal business; and the application of the rule against class members meeting—presented numerous individualized inquires.

On the off-the-clock work claim, the court concluded there was no evidence any rule prohibiting putative class members from taking coveralls home was applied uniformly to the class. Likewise, the court determined plaintiffs provided no evidence the time employees spent booting up or turning off computers was required to be performed off the clock.

The court found individual questions were likely to arise in the litigation rather than common ones, thus class treatment would not be superior or substantially beneficial to the litigants or the court. The court further held plaintiffs could not bring their PAGA claim as a representative action because individual issues would predominate and a representative action would not be manageable. The court sustained several evidentiary objections to the Frias declaration, and also concluded plaintiffs' cocounsel Ken M. Fitzgerald was not qualified to act as class counsel.[6]

Plaintiffs' appeal timely followed.

---

[6]     The court noted Fitzgerald might be able to overcome the deficiencies the court identified, "if he can show that he is prepared to prosecute the case in association with Louis P. Marlin, who is qualified to act as class counsel."

**DISCUSSION**

## I. Legal Principles of Class Certification

As both sides acknowledge, the California Supreme Court recently considered issues surrounding the certification of class action claims for meal and rest break violations in *Brinker Restaurant Corporation v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*). The court summarized the general requirements for certification of a class: "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. (Code Civ. Proc., § 382; [citations].) 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' [Citation.]" (*Id.* at p. 1021.)

As in *Brinker*, the disputed issue in this case is whether individual or common questions would predominate in any classwide litigation. The *Brinker* court explained "[t]he 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' [Citations.]" (*Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022, fn. omitted.)

14

The *Brinker* court further explained the task of the reviewing court: "On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record. . . .' " (*Brinker, supra,* 53 Cal.4th at p. 1022, citing *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 328-329 (*Sav-On*).)

## II.     The Trial Court Did Not Abuse Its Discretion in Denying Certification

Plaintiffs contend the trial court erred in concluding individual questions would predominate in the litigation. Specifically, plaintiffs argue the evidence showed specific Gas Company policies were applicable to all putative class members. Based on those policies, plaintiffs assert the Gas Company failed to provide class members with legally compliant meal and rest breaks, and caused employees to work off the clock. We separately consider the meal/rest break claim and the off-the-clock claim.[7]

---

[7]     The trial court did not separately address plaintiffs' rest break claim. On appeal, plaintiffs do not separately address the trial court's error, if any, in denying certification of a rest-period class. Thus, without deciding that any meal break analysis was wholly applicable to the rest break claims, we consider the claims together.

15

### A. Meal/Rest Breaks

1. Relevant Legal Background

We first briefly consider the underlying legal principles applicable to plaintiffs' claims. Under Wage Order No. 4, "No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes . . . . Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked." (Cal. Code Regs., tit. 8, § 11040, subd. 11(A).) "An employer also has a duty to authorize and permit rest breaks; the number of breaks depends on the length of the shift. (Cal. Code Regs, tit. 8, § 11040, subd. 12; *Brinker*, *supra*, 53 Cal.4th at pp. 1028-1031.)" (*Bradley v. Networkers International, LLC* (2012) 211 Cal.App.4th 1129, 1149 (*Bradley*).)

Plaintiffs' legal theory hinges on whether the field operations employees were "relieved of all duties," and whether Gas Company restrictions on employee conduct converted meal periods into "hours worked."[8] Plaintiffs rely on cases such as *Madera Police Officers Association v. City of Madera* (1984) 36 Cal.3d 403 (*Madera*), in which the California Supreme Court concluded the "substantial limitations" placed on the plaintiff police officers during their noncompensated meal periods "converted that time into hours worked." (*Id.* at p. 409.) The court adopted a two-step analysis that considered "whether the restrictions on off-duty time are primarily directed toward the fulfillment of the employer's requirements and policies," and "whether the employee's off-duty time is so substantially restricted that they are unable to engage in private pursuits." (*Ibid.*) *Madera* did not involve state wage and overtime laws. But courts have

---

[8] California law requires employers to pay employees for all hours worked, and the IWC wage orders largely define "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (See Cal. Code Regs., tit. 8, § 11040, subd. 2(K); *Morillion v. Royal Packing Company* (2000) 22 Cal.4th 575, 581 (*Morillion*) [all 15 wage orders contain same definition of hours worked, with exception of two which include additional language].)

since applied a similar analysis to workers in other industries governed by state Labor Code provisions and wage orders, largely in "on-call" contexts other than meal periods.

Thus, for example, in *Morillion*, our high court concluded time agricultural workers were required to spend on the employer's shuttle bus taking them to the fields was compensable. (*Morillion, supra*, 22 Cal.4th at p. 595.) During this travel time, the plaintiff workers were "foreclosed from numerous activities in which they might otherwise engage if they were permitted to travel to the fields by their own transportation," such as running errands requiring the use of a car or stopping for breakfast. (*Id.* at p. 586.) The employer thus prohibited the workers from "effectively using their travel time for their own purposes." (*Ibid.*) The court explained in part, the "level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, is determinative . . . . [¶] . . . [¶] . . . by requiring employees to take certain transportation to a work site, employers thereby subject those employees to its control by determining when, where, and how they are to travel. Under the definition of 'hours worked,' that travel time is compensable." (*Id.* at pp. 587-588, citations omitted; see also *Seymore v. Metson Marine, Inc.* (2011) 194 Cal.App.4th 361, 373-376 (*Seymore*) [workers on oil spill recovery vessels; standby time during two-week work periods]; *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1535 (*Ghazaryan*) [describing multifactor test set forth by Ninth Circuit in *Berry v. County of Sonoma* (9th Cir. 1994) 30 F.3d 1174, and adopted in Department of Labor Standards Enforcement (DLSE) opinion letter of Dec. 28, 1998].)

Similarly, in *Bono Enterprises, Inc. v. Bradshaw* (1995) 32 Cal.App.4th 968 (*Bono*), disapproved on other grounds in *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 574, the court concluded a DLSE decision requiring an employer to pay employees for meal periods if the employees are required to remain at the worksite, was consistent with the IWC wage order definition of "hours worked" and the requirement of a duty-free meal period. (*Bono*, at pp. 974-975.) The court explained: "When an employer directs, commands or restrains an employee from leaving the work place during his or her lunch hour and thus prevents the employee from using the time

17

effectively for his or her own purposes, that employee remains subject to the employer's control. According to [the definition of hours worked], that employee must be paid." (*Id.* at p. 975; see *Morillion, supra,* 22 Cal.4th at p. 583.)

A 1992 DLSE opinion letter specifically addresses the issue of whether an employee who is required to wear a pager during a meal period is entitled to compensation for that meal period.[9] The DLSE opinion letter noted the analysis of *Madera* "is not so responsive to situations involving such use during scheduled meal periods because of the specific requirement that meal periods be 'duty free.'" (DLSE Opn. Ltr. No. 1992.01.28, pp. 2-3.) The DLSE then articulated the following policy:

"If the employee is simply required to wear a pager or respond to an in-house pager during the meal period there is no presumption that the employee is under the direction or control of the employer so long as no other condition is put upon the employee's conduct during the meal period. If, on the other hand, the employer requires the employee to not only wear the pager or listen for the in-house paging system, but also to remain within a certain distance of a telephone or otherwise limits the employee's activities, such control would require that all of the meal period time be compensated. [¶] So long as the employee who is simply required to wear the pager is not called upon during the meal period to respond, there is no requirement that the meal period be paid for. On the other hand, if the employee responds, as required, to a pager call during the meal period, the whole of the meal period must be compensated." (DLSE Opn. Letter No. 1992.01.28, p. 3.)

And, more recently, in *Brinker*, the court explained the fundamental employer obligation associated with a meal break is "to relieve the employee of all duty and relinquish any employer control over the employee and how he or she spends the time." (*Brinker*, *supra*, 53 Cal.4th at pp. 1038-1039.) The court further summarized the

_____

[9] DLSE opinion letters are not controlling upon the courts but " ' " ' "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " ' " (*Brinker, supra,* 53 Cal.4th at p. 1029, fn. 11, citations omitted.)

18

employer's duty with respect to meal breaks as satisfied if the employer "relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." (*Id.* at p. 1039.)

2. Analysis

Plaintiffs contend their meal/rest break claim is based on the theory that field operations employees were never relieved of all duties during breaks, even if they never were called upon to perform any work-related duties. Plaintiffs argue that Gas Company policy required field operations employees to be available to respond to emergency contacts during their meal and rest breaks. They further contend the Gas Company uniformly applied other restrictions to putative class members on break periods, such that the breaks were transformed into "on-duty" periods.

The Gas Company argues there is no evidence of a uniform companywide policy regarding putative class members' conduct except that they must respond to certain rare emergency calls, and that policy alone is an insufficient basis of liability. It contends that to the extent there were other conditions placed on some employees, these were not companywide policies, thus class treatment is inappropriate because individual questions would predominate in any determination of what those limitations were, or how restrictive they were. To the extent there were other companywide policies, the Gas Company contends plaintiffs' theories based on these restrictions cannot support liability.

The issue before the trial court, and before us, is class certification only. " 'The certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious." ' [Citations.]" (*Brinker, supra,* 53 Cal.4th at p. 1023.) Whether plaintiffs' theories of liability are ultimately valid or invalid, in considering the predominance element, the trial court's task was to determine " 'whether the theory of recovery advanced by the proponents of certification is, as an analytical

19

matter, likely to prove amenable to class treatment.' [Citation.]"**10** (*Id.* at p. 1021.) And, *Brinker* instructs that "[c]laims alleging that a *uniform policy consistently applied* to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment." (*Id.* at p. 1033, italics added.)

In this case, then, the question was whether plaintiffs presented substantial evidence of a systematic company policy or policies that allegedly rendered break periods compensable as hours worked. (See *Brinker, supra,* 53 Cal.4th at p. 1051 [class treatment inappropriate where plaintiff did not present substantial evidence of systematic company policy to require off-the-clock work].) Plaintiffs allege the failure to relieve of duties is demonstrated by several of the Gas Company's companywide policies that are applicable to all putative class members. But the trial court concluded the evidence did not demonstrate these policies were in fact uniformly applied to all putative class members, thus requiring individualized questions as to the degree of restraint the company imposed on individual members during their meal and rest breaks.

We are mindful of the standard of review: "[I]n the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [Citation.]' [citation]. Under this standard, an order based upon improper criteria or incorrect assumptions calls for reversal ' "even though there may be substantial evidence to support the court's order." ' [Citations.] Accordingly, we must examine the trial

---

**10** In *Brinker*, the court reiterated that in general, a court should not decide the merits of a plaintiff's legal theory in the context of a class certification decision. While parties may jointly consent to have a court decide the merits of underlying substantive legal issues (*Brinker, supra,* 53 Cal.4th at p. 1026; *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 443 (*Linder*)), here plaintiffs did not request or consent to a decision on the merits of its legal theories. Further, the trial court's analysis was by and large focused only on the certification question and avoided the merits of plaintiffs' claims. Thus, the Gas Company's extended briefing regarding the *validity* of plaintiffs' legal theories is irrelevant to the issues presented in this appeal and we need not consider those arguments.

court's reasons for denying class certification. 'Any valid pertinent reason stated will be sufficient to uphold the order.' [Citation.]" (*Linder, supra,* 23 Cal.4th at pp. 435-436.)

We turn first to one of the plaintiffs' critical allegations, that the Gas Company policies prevented putative class members from engaging in personal business during their breaks. Substantial evidence supported the trial court determination that plaintiffs did not establish the existence of a uniform, consistently applied policy, restricting employees from conducting personal activities during their meal and rest breaks.

Initially, we note there was no evidence that Gas Company had any policy, whether formal or informal, explicitly prohibiting employees from conducting personal business during meal breaks. Indeed, plaintiffs' evidence included deposition testimony from a Gas Company PMK witness who testified that field operations employees are allowed to conduct personal business during their breaks. Even the named plaintiffs did not declare they were explicitly prohibited from conducting personal business during breaks. However, plaintiffs alleged a written policy prohibiting the personal use of company vehicles and the requirement that employees stay "in route" severely limited putative class members' ability to engage in any personal activities. Yet, despite the written policy prohibiting the personal use of company vehicles, there was substantial evidence before the trial court indicating this was not a uniform prohibition consistently applied across the company disallowing personal use of vehicles during breaks. Gas Company evidence included declarations from multiple supervisors indicating employees under their supervision were allowed to drive company vehicles to fast food restaurants, convenience stores, or "other locations," to take their meal or rest breaks. Several declared their supervisees were allowed to take their breaks anywhere they wanted, limited only by the amount of time they had for the break. The Gas Company further provided evidence indicating putative class members were free to go anywhere they wished on foot, after parking and locking the company vehicle.

The trial court could reasonably conclude plaintiffs did not present evidence establishing the prohibition against personal use of company vehicles was a uniform policy consistently applied to putative class members, particularly as it related to an

alleged restriction on conducting personal business during breaks, such that it would be amenable to a common method of proof. (*Sav-On, supra,* 34 Cal.4th at p. 328 [" '[W]here a certification order turns on inferences to be drawn from the facts, " 'the reviewing court has no authority to substitute its decision for that of the trial court.' " ' "].)

Similarly, there was evidence establishing a companywide policy of requiring employees to stay "in route," but there was also evidence indicating there was no uniform definition of the term, and variations among supervisors as to their interpretation of the requirement. While some supervisors declared employees were given leeway during breaks so long as they were heading in the same direction as their next order, others considered it acceptable for employees to drive a few minutes or a few blocks out of the route during a break; some indicated they told employees they could drive even farther afield if that is how they wished to spend their break time.

This issue is: was there a uniformly applied companywide policy that would allow for a common method of proof? Was there substantial evidence to support the trial court's finding that plaintiffs did not make a factual showing that the policies they alleged could be established by common evidence? Given that plaintiffs' theory of liability depends on the level of restriction and control exercised over putative class members during their meal breaks, substantial evidence supported the trial court's determination that individual questions would predominate on the issue of whether the prohibition on personal use of company vehicles applied during meal breaks, and the "in route" requirement, constituted a level of control that turned the breaks into compensable time.

Plaintiffs alleged other Gas Company policies demonstrated it exerted control over putative class members during their meal breaks, and that these were also companywide policies. However, we need not consider each policy individually. Plaintiffs' theory of liability is that the Gas Company did not provide putative class members duty-free meal/rest periods because it did not relinquish control over them. The legal authorities upon which plaintiffs rely indicate the central issues are the *level* of control, and whether

22

employees may use the break time for their own purposes.  (See, e.g., *Morillion, supra,* 22 Cal.4th at pp. 583, 586-587; *Bono, supra,* 32 Cal.App.4th at p. 975.)

For example, in *Seymore*, and *Gomez v. Lincare, Inc.* (2009) 173 Cal.App.4th 508, 523, courts attempting to determine whether on-call time was compensable considered factors such as excessive geographical restrictions on employee's movements, the frequency of calls while the employees were on call, " ' "whether a fixed time limit for response was unduly restrictive," ' " and " ' "whether the employee had actually engaged in personal activities during call-in time." ' "  (*Seymore, supra,* 194 Cal.App.4th at p. 374; *Gomez,* at p. 523.)  Assuming without deciding that the reasoning of these cases would be persuasive in a case involving meal or rest breaks rather than "standby" or "on call" time, the cases explain that the extent to which plaintiffs are able to use the challenged time for personal activities is a critical factor.  (*Seymore,* at p. 374; *Gomez*, at pp. 523-524.)

Here, there was substantial evidence the Gas Company did not have a companywide policy consistently applied to putative class members relating to the personal use of company vehicles, or uniform geographic restrictions, that directly or indirectly limited field operations employees' ability to use their break time for personal activities.  (*Brinker, supra,* 53 Cal.4th at pp. 1033, 1051; *Sav-On, supra,* 34 Cal.4th at p. 338; *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 733.)  Given the centrality of this allegation to plaintiffs' theory of liability, the trial court could reasonably conclude individual questions would predominate in any litigation of their claims, even if there was also evidence of *some* companywide policies governing employee availability for emergencies or restraints on employee conduct during breaks.

Two cases reaching different results on certification illustrate the point.  In *Ghazaryan, supra,* 169 Cal.App.4th 1524, a limousine driver sought certification of a class action on behalf of similarly situated drivers.  The action alleged the employer violated wage and hour laws by failing to compensate drivers for on-call time between assignments.  The Court of Appeal concluded that on the community of interest factor, the trial court erred in denying certification because it incorrectly focused on the

23

difficulty of evaluating the validity of the employer's compensation policy in light of variations in how drivers spent their on-call time, rather than on the reasonableness of the employer's policies as applied to its drivers as a whole. (*Id.* at pp. 1527-1528, 1534.) The court noted the record revealed the employer dictated to a large extent how the drivers used their time, in part through a handbook distributed to all drivers which set forth various policies governing drivers' conduct and activities during the on-call periods. The limitations described in the handbook applied "across the board" to all drivers who had on-call time. (*Id.* at p. 1536.) Although the employer offered evidence suggesting some drivers used their on-call time for their own purposes, the court concluded this evidence did not change the fundamental legal question presented by the suit. The court explained: "Although individual testimony may be relevant to determine whether these policies unduly restrict the ability of drivers as a whole to utilize their on-call time for personal purposes, the legal question to be resolved is not an individual one. To the contrary, the common legal question remains the overall impact of [the employer's] policies on its drivers, not whether any one driver, through the incidental convenience of having a home or gym nearby to spend his or her gap time, successfully finds a way to utilize that time for his or her own purposes." (*Ibid.*)

In *Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133 (*Soderstedt*), the court reached a different result. The plaintiffs were accountants seeking certification of a class to prosecute wage and hour claims resulting largely from misclassification. The plaintiffs argued their claims were subject to common proof because the classification question could be resolved by evaluating the employer's policies and procedures. (*Id.* at p. 152.) The court rejected this argument, explaining that even where an alleged misclassification involves application of a uniform policy, individualized inquiry may be necessary "because the policy may properly classify some employees as exempt but not others." (*Id.* at p. 153.) Although the employer "maintained uniform internal policies," the "evidence showed that the manner in which those policies and standards were implemented as to each [putative class member] varied depending on multiple factors." (*Id.* at p. 154.) The court thus concluded substantial

evidence supported the trial court's determination that common issues did not predominate. (*Ibid.*)

We find this case to be more similar to *Soderstedt* than *Ghazarayan*. Although plaintiffs allege uniform policies may be used to prove their claim that putative class members were denied duty-free meal/rest periods, there was substantial evidence that several of these policies were not in fact uniform or consistently applied. In *Ghazarayan*, the record established, with apparently undisputed evidence, that the employer dictated how putative class members were to use their standby time. Here, the Gas Company disputes the uniformity and consistency of application of the critical policies plaintiffs rely upon to support their claims. Individualized evidence would be required to resolve simply the existence of these alleged uniform policies, and the extent to which they were in fact applied.

Two cases decided after *Brinker* likewise provide an instructive contrast. In *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341 (*Wet Seal*), the appellate court affirmed a trial court order denying class certification. The plaintiffs were sales employees at the defendant's clothing stores. They alleged they were required to wear defendant's merchandise, but were not reimbursed for the merchandise they purchased to wear, and that they were not reimbursed for mileage for their work-related travel. (*Id.* at p. 1350.) Plaintiffs' legal theory was that the defendant's unlawful practices were reflected in written company policies which applied to all members of the putative class. (*Id.* at p. 1346.) The trial court denied certification, concluding individual questions would predominate as the defendant's company policies did not provide a common method of classwide proof on central liability questions. (*Id.* at p. 1353.)

The Court of Appeal agreed. Although the plaintiffs purported to base their claims on the defendant's company policies, the written policies did not on their face support the plaintiffs' claims. The dress code policy did not require employees to wear defendant's merchandise, and the plaintiffs' other evidence—consisting mainly of declarations from putative class members—did not demonstrate any common dress code practices. (*Wet Seal, supra,* 210 Cal.App.4th at pp. 1356-1357.) Similarly, the defendant's written travel

25

reimbursement policy did not support plaintiffs' allegations, and plaintiffs themselves categorized the policy in practice as "hit or miss." (*Id.* at p. 1357.) Thus, the Court of Appeal concluded the plaintiffs did not produce substantial evidence of a companywide policy which could be used to establish classwide liability. The written policies alone did not constitute substantial evidence that defendant engaged in unlawful practices, and the plaintiffs' other evidence reinforced the conclusion that liability would have to be decided on an individualized basis. (*Id.* at pp. 1362, 1364, 1368.) The employer disputed that any unlawful policies existed, and the plaintiffs failed to establish there was any classwide method of proof for resolving that liability question. (*Id.* at pp. 1362-1363.)

In contrast, in *Bradley, supra,* 211 Cal.App.4th 1129, the appellate court applied *Brinker* and reversed a trial court order denying certification to a class of allegedly misclassified employees who were also denied meal and rest breaks. The court noted there was *undisputed* evidence showing the defendant had "consistent companywide policies applicable to all employees regarding work scheduling, payments, and work requirement." (*Bradley,* at p. 1147.) Irrespective of the merits of the misclassification claim, the court explained "[t]he critical fact is that the evidence likely to be relied upon by the parties would be largely uniform throughout the class." (*Ibid.*) With respect to the meal and rest break claims, the court noted the defendant did not present any evidence showing it had a formal or informal policy of permitting legally required breaks, that any worker believed he or she was entitled to take legally required breaks, that some or all workers took the breaks, or evidence that its "meal or break policies (or the failure to institute such policies) were *different* with respect to each worker." (*Id.* at p. 1150.)

The court thus concluded, "plaintiffs' theory of recovery is based on [the defendant's] (uniform) *lack* of a rest and meal break policy and its (uniform) *failure* to authorize employees to take statutorily required rest and meal breaks. The lack of a meal/rest break policy and the uniform failure to authorize such breaks are matters of common proof. Although an employer could potentially defend these claims by arguing that it did have an informal or unwritten meal or rest break policy, this defense is also a matter of common proof." (*Bradley, supra,* 211 Cal.App.4th at p. 1150.) The defendant

argued the issue of which employees missed breaks, how many breaks were missed, and the reasons employees missed breaks was highly individualized. The court acknowledged this was true, but concluded that, under *Brinker*, "when an employer has not authorized and not provided legally required meal and/or rest breaks, the employer has violated the law and the fact that an employee *may* have actually taken a break or was able to eat food during the workday does not show that individual issues will predominate in the litigation." (*Bradley*, at p. 1151.)

Here, as in *Wet Seal*, plaintiffs have alleged they can prove their claims using evidence of companywide policies, but the Gas Company disputes the uniformity of those policies, and plaintiffs have not established the dispute may be resolved with common proof rather than individualized showings. And, in contrast to *Bradley*, there is no undisputed evidence showing consistent companywide policies that uniformly restricted putative class members' use of company vehicles for personal use or their movement during breaks.

We find no trial court abuse of discretion with respect to the meal/rest break claim.

## B. Off-the-clock Claims: Donning/Doffing Uniforms and Computer Use

Substantial evidence also supported the trial court finding that individual questions would predominate in litigation of plaintiffs' off-the-clock work claims. Plaintiffs alleged Gas Company policies required putative class members to be dressed in a uniform or coveralls at the start of their shift, but they were prohibited from taking their work attire home, and were limited to wearing work attire only in the performance of work, thus they were forced to spend uncompensated time before their shifts getting dressed in work attire. However, plaintiffs offered no evidence of a companywide policy prohibiting employees from getting dressed in work clothing on the clock at the beginning of their shifts.[11] Further, although plaintiffs offered evidence that a collective

---

[11]    The one citation to the record plaintiffs offer on appeal to support this point refers only to the declaration of Frias, in which he declared he was aware of Gas Company employees being disciplined for not being in a uniform or coveralls at the start of a shift. Aside from the evidentiary issues surrounding this declaration, even if admitted, the

bargaining agreement provision indicated workers were not to take coveralls home with them in most cases, the Gas Company offered evidence indicating it had waived that provision, and it was not widely known within the company. In addition, the Gas Company offered evidence that in practice employees were allowed to take coveralls and uniforms home with them, and did so. Indeed, the only evidence plaintiffs offered on this claim were their own declarations, the collective bargaining agreement provision, and Frias's declaration. No substantial evidence pointed to a uniform, consistently applied companywide policy requiring employees to don and doff uniforms during uncompensated time, or prohibiting class members from wearing work attire to and from their base.

Similarly, no substantial evidence pointed to a uniformly applied, companywide policy requiring employees to boot up or shut down their mobile computers while they were off the clock. Plaintiffs offered no evidence of any policy relating to the booting up or shutting down of computers, and no evidence that any employees were required by company policy or practice to engage in these activities in off-the-clock time. Even the named plaintiffs' own declarations stated only that they were required to engage in work activities before and after their shifts, without providing any specifics. To the extent the named plaintiffs were required to perform off-the-clock work, their evidence indicates only that their claims arose from the individual actions of particular supervisors. As such, the trial court could reasonably conclude based on the evidence that individual questions would predominate in any litigation of these claims. (*Bradley, supra,* 211 Cal.App.4th at p. 1156.)

---

statement did not provide substantial evidence of a uniformly applied companywide policy prohibiting employees from donning uniforms or coveralls during paid time. The same is true of Frias's other statements regarding the other challenged policies in this case. Frias's declaration at best provided only anecdotal evidence of discipline rather than evidence of uniformly applied companywide policies. In light of our conclusions above, we need not consider plaintiffs' argument that the trial court erred in sustaining objections to portions of the Frias declaration.

The trial court did not abuse its discretion in denying certification of a class based on the off-the-clock claims. (*Brinker, supra,* 53 Cal.4th at pp. 1051-1052.)

## III.  Superiority and Adequacy of Class Counsel

Plaintiffs also challenge the trial court's determination that a class action would not be a superior method of resolving this case. The court's decision was based on its conclusion that individual questions would predominate in the litigation, and the claims brought on behalf of the class would be "difficult if not impossible to manage." We have affirmed the trial court's conclusion as a proper exercise of its discretion. We similarly find substantial evidence established class treatment was not superior in this action because individual questions would predominate, requiring numerous "mini-trials." (*Soderstedt, supra,* 197 Cal.App.4th at p. 157; *Ali v. U.S.A. Cab Ltd.* (2009) 176 Cal.App.4th 1333, 1353.) In light of our conclusions affirming the denial of certification of the class claims, we need not consider plaintiffs' argument that the trial court erred in finding cocounsel Fitzgerald inadequate as class counsel. (*Ali,* at p. 1353.)

## IV.  The Trial Court Erred in Denying the PAGA Claim

Plaintiffs argue the trial court erred in denying their representative PAGA claim. Plaintiffs assert the trial court improperly applied class action requirements to the claim, and alternatively adopt their arguments regarding the trial court's conclusions on predominance. We agree that the trial court abused its discretion in applying class action requirements to the PAGA claim.

*Arias v. Superior Court* (2009) 46 Cal.4th 969, 984 (*Arias*), is the controlling decision. Under PAGA, "an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations. (Lab. Code, § 2699, subd. (a).)"**12** (*Arias*, at p. 980.) In *Arias*, the

---

**12**    Labor Code section 2699, subdivision (a) provides: "Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an

plaintiff sought civil penalties under PAGA, and asserted UCL claims (Bus. & Prof. Code, § 17200 et seq.), for himself and other employees for alleged Labor Code violations. (*Id.* at pp. 976, 981.) The trial court granted the defendants' motion to strike the representative causes of action on the ground that the plaintiff failed to comply with pleading requirements for class actions. The Court of Appeal held the representative claims under the UCL were subject to class action requirements, but the PAGA claims were not. (*Ibid.*)

In the California Supreme Court, the defendants challenged the appellate court ruling on the PAGA claims, while the plaintiff challenged the court's ruling as to the representative UCL claims. Our high court affirmed the appellate court ruling. On the UCL claims, the court concluded Proposition 64 allowed private plaintiffs to bring representative actions under the UCL only if they comply with class action requirements set forth in Code of Civil Procedure section 382.[13] (*Arias, supra,* 46 Cal.4th at pp. 977-978, 980.)

However, our Supreme Court rejected the defendants' argument that the plaintiff was also required to satisfy class action requirements when seeking civil penalties on a representative basis under PAGA. The court considered and dismissed arguments that not requiring compliance with class action requirements would lead to "absurd results,"

---

aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3." Labor Code section 2699, subdivision (c) defines "aggrieved employee" as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."

[13]    Code of Civil Procedure section 382 provides: "If the consent of any one who should have been joined as plaintiff cannot be obtained, he may be made a defendant, the reason thereof being stated in the complaint; and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

would conflict with the legislative intent of the act, or would violate the due process rights of defendant employers and nonparty aggrieved employees. (*Arias, supra,* 46 Cal.4th at pp. 982-985.) The court concluded the plaintiff was not required to satisfy Code of Civil Procedure section 382 requirements to pursue civil penalties on a representative basis under PAGA.

While the Gas Company acknowledges the holding of *Arias*, it contends the trial court could still deny plaintiffs' PAGA claim on the ground that the litigation would be unmanageable. However, the court's finding of unmanageability was based entirely on the conclusion that plaintiffs had not satisfied the community interest prong for class action certification, specifically by failing to establish common questions would predominate in the litigation. Since, under *Arias*, a plaintiff need not even plead a representative PAGA claim in accordance with class action requirements, it seems anomalous to require that the plaintiff establish the community of interest class action requirement with respect to a PAGA claim, in the context of a class certification procedure. Indeed, the Gas Company has offered no authority suggesting such a procedure is authorized or appropriate. The authorities the Gas Company cites all pre-date *Arias*, they all concern representative claims under the UCL (prior to Proposition 64), and they do not support the company's position.

For example, in *Bronco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699 (*Bronco Wine*), the plaintiff, a grape grower, sued a winery operator, on a breach of contract theory. The plaintiff also sought restitution, on behalf of itself and other grape growers under contract with the defendant, as compensation for unfair business practices, such as wrongfully rejecting grapes, applying quality standards unreasonably in order to pay less for grapes than a previously agreed upon price, and threatening to sue growers who complained. (*Id.* at p. 715.) The trial court awarded restitution to several nonparty grape growers. The Court of Appeal concluded this was error because nonparty growers were not given notice of the proceedings or an opportunity to be heard before judgment. (*Id.* at pp. 718-719.) The procedure the trial court used to grant awards to certain nonparties raised "serious fundamental due process

31

considerations." (*Id.* at p. 717.) The court noted that the determination of whether the challenged business practice was unfair was complex, and the potential amount of restitution per grower was significant and not determined by an automatic calculation. (*Id.* at p. 720.) The growers also had an alternative administrative remedy. (*Id.* at pp. 720-721.) Although the court issued restitution awards to 27 nonparty grape growers, contracts of only 20 nonparty grape growers were introduced into evidence. (*Id.* at pp. 716, 718.) Disputes arose because the defendant asserted 12 of the growers had already released their claims. (*Id.* at p. 718.) Under those circumstances, the court concluded the trial court abused its discretion in denying the defendant's pretrial motion to strike claims asserted on behalf of nonparty growers or require that a class action procedure be utilized. (*Id.* at pp. 715, 721.)

*Bronco Wine* does not mandate an outcome in this case. Here, there is a California Supreme Court case explicitly holding that an aggrieved employee need not meet class action requirements to bring a PAGA claim seeking civil penalties for himself and other aggrieved employees.[14] *Arias* considered, and rejected, claims that allowing PAGA claims without mandating class action requirements would create due process problems, a primary concern of the court in *Bronco Wine*. Moreover, the court in *Bronco Wine* was concerned with the difficulty of making awards of restitution under the UCL. Under PAGA, a plaintiff may only pursue civil penalties on behalf of himself and other aggrieved employees. The amount of the penalties are set forth in the statute. (Lab. Code, § 2699, subd. (f).) Unmanageability due to the difficulty of determining individualized restitution awards is not present in a PAGA claim, as it may have been in some representative UCL claims before Proposition 64.

---

[14]     Indeed, the *Bronco Wine* court expressed skepticism that it was "proper to maintain an individual, representative action for unfair competition outside the confines of a class action." (*Bronco Wine, supra,* 214 Cal.App.3d at p. 720.)

The federal district court cases defendant relies upon similarly rejected representative UCL claims because of the problems inherent in determining *restitution* awards when the economic losses suffered by each nonparty varied significantly. (See, e.g., *Marshall v. Standard Insurance Company* (2000) 214 F.Supp.2d 1062, 1070, 1072-1073 [pursuant to motion to dismiss, dismissing representative UCL claim related to alleged bad faith handling of disability claims; amount of restitution for each nonparty could not be determined with straightforward calculation and would not be nominal or identical; allowing representative claim for injunctive relief]; *Barnett v. Washington Mutual Bank* (N.D.Cal. Sept. 9, 2004, C 03-00753 CRB) 2004 U.S. Dist. Lexis 18491 [striking representative claim under UCL to the extent it sought restitution because amount of restitution per party was large and amounts of overtime were not recorded, making determination of amount of restitution complicated]; *Nachum v. Allstate Insurance Company* (C.D.Cal. July 22, 1997, CV 97-4493) 1997 U.S. Dist. Lexis 12670 [dismissing UCL representative claim alleging bad faith in claims handling for earthquake property damage; court could not award restitutionary relief and provide due process without litigating individualized bad faith claims]; see also *Lazar v. Trans Union LLC* (C.D.Cal. 2000) 195 F.R.D. 665, 673-674 [district court granted motion to strike representative UCL claim because range of possible damages was wide and plaintiff's circumstances were different from those of fellow consumers; court determined plaintiff's circumstances were "unusual" thus he was not a reasonable representative].)

Likewise, *South Bay Chevrolet v. General Motors Acceptance Corporation* (1999) 72 Cal.App.4th 861 (*South Bay*), also concerned representative claims under the UCL, prior to the passage of Proposition 64. The plaintiff, an automotive dealership, asserted an individual claim for unfair business practices, a representative claim on behalf of other California dealerships, and class action allegations. After unsuccessful summary judgment motions, the parties stipulated to the dismissal of the plaintiff's class action allegations. (*Id.* at pp. 874-875.) The matter then proceeded to a court trial. At the close of the plaintiff's case, the trial court granted a motion for judgment on the representative claim. The Court of Appeal found the lower court properly concluded the plaintiff did

33

not meet its burden to establish other dealerships were "similarly situated as to their likelihood of deception," or that any other dealership was likely to be deceived by the defendant's practices. (*Id.* at p. 894.) Thus, the trial court "properly determined it could not make any determination that [defendant] was liable statewide." (*Id.* at p. 895.) The appellate court noted the evidentiary record demonstrated there were disparate ways in which the dealerships understood the defendant's practices, and based upon this record, the trial court acted within its discretion in concluding there was an insufficient level of uniformity to allow representative treatment. (*Id.* at p. 897.)

Even assuming the *South Bay* court's analysis is applicable to a PAGA claim, we note a critical distinction between *South Bay* and this case. The trial court in *South Bay* dismissed the representative UCL claim only after the plaintiff's presentation of evidence at a bench trial revealed the absence of a statewide claim. The plaintiff thus had the opportunity to prove there were similarly situated dealerships it could properly represent, and it failed to do so. In this case, there has been no such opportunity, and no analogous trial court exercise of discretion based on an evidentiary hearing, or other means of addressing the plaintiff's ability to prove an element of his or her case, such as a demurrer or motion for summary adjudication. A conclusion, made in the context of a class certification motion, that individual questions would predominate in companywide class litigation, thereby rendering *class action* treatment inappropriate, is not the same as a conclusion that the plaintiffs cannot establish there are other "aggrieved persons" they may properly represent in a PAGA claim. (See, e.g., *Rix v. Lockheed Martin Corporation* (S.D.Cal. Jan. 4, 2012, Civ. No. 09cv2063 MMA (NLS)) 2012 U.S. Dist. Lexis 653 [district court denied class certification because individual inquiries would predominate over common questions but allowed PAGA representative claim to proceed; court concluded it was premature to strike claim given the reasonable possibility plaintiff could ultimately seek to litigate a "manageable PAGA claim"; limiting subsequent discovery accordingly].)

We further find persuasive the following discussion from a recent case, *Plaisted v. Dress Barn, Inc.* (C.D.Cal. Sept. 20, 2012, No. 2:12-CV-01679-ODW (SHx)) 2012 U.S. Dist. Lexis 135599:

"This Court adheres to the majority position allowing representative PAGA claims to proceed without class certification under [Federal Rule of Civil Procedure] 23. The Court agrees that representative PAGA actions fundamentally differ from class actions insofar as PAGA's 'plain purpose is to protect the public interest through a unique private enforcement process, not to allow a collection of individual plaintiffs to sue the same defendant in one consolidated action for the sake of convenience and efficiency.' [Citation.] . . . .

"Dress Barn further contends that even if Plaisted's PAGA claim does not automatically fail for want of Rule 23 certification, the PAGA claim should still be dismissed because the individualized determinations required under PAGA would make trying such a claim unmanageable. . . .

". . . Yet, all of the authorities Dress Barn cites in support of its position required individualized restitution calculations under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200-17210. [Citations.] Unlike California's UCL, PAGA does not provide for equitable restitutionary or injunctive relief; instead, plaintiffs bringing representative PAGA actions can recover only statutory penalties in fixed amounts per violation. *See* Cal. Lab.Code § 2699(f). And unlike class or representative actions seeking damages or injunctive relief for injured employees, the purpose of PAGA 'is to incentivize private parties to recover civil penalties for the government that otherwise may not have been assessed and collected by overburdened state enforcement agencies.' [Citation.] To hold that a PAGA action could not be maintained because the individual assessments regarding whether a violation had occurred would make the claim unmanageable at trial would obliterate this purpose, as every PAGA action in some way requires *some* individualized assessment regarding whether a Labor Code violation has occurred. Further, the individualized assessment necessary in a PAGA action would come nowhere close to the individualized and fact-intensive restitution calculations necessary under the UCL, and is in fact an inherent aspect of a PAGA claim." (Fns. omitted.)

(See also *Alcantar v. Hobart Service* (C.D.Cal. Jan. 14, 2013, No. ED CV 11-1600 PSG (SPx)) 2013 U.S. Dist. Lexis 5443 [despite denial of class certification, plaintiff allowed

to pursue representative PAGA claim; rejecting argument that PAGA claim would require multiple minitrials]; see also *Aleman v. AirTouch Cellular* (2012) 209 Cal.App.4th 556, 576, fn. 8 [unpublished federal decisions citable as persuasive authority.)

The parties have not identified any California cases specifically considering whether the trial court may deny a representative PAGA claim on the ground that individual questions would make the litigation unmanageable. But in this case, the trial court's finding of unmanageability was based entirely on plaintiffs' failure to establish the community of interest prong necessary for class certification. Given the guidance from *Arias*, we conclude the trial court abused its discretion in applying class action certification standards to evaluate the PAGA claim.

### DISPOSITION

The trial court order denying certification of class claims is affirmed. The order denying plaintiffs' PAGA claim is reversed. The parties shall bear their own costs on appeal.


BIGELOW, P. J.

We concur:



RUBIN, J.



GRIMES, J.


36